Argued at Pendleton May 5, 1930; affirmed January 3, 1931

# DODDS ET AL. *v.* MAYER ET UX.
## (294 P. 1040)

*R. S. Hamilton,* of Bend, for appellants.

*Jay H. Upton,* of Bend, for respondents.

ROSSMAN, J. This is a suit to cancel a deed executed by John Bielli, now deceased, in which the defendants, husband and wife, are the grantees. One of the plaintiffs is the administrator of the estate of Bielli, the others are the beneficiaries named in his will. A cancelation is sought upon a charge that the execution and delivery of the deed were obtained by fraud and undue influences practiced by the defendants. Briefly stated the complaint alleges that April 7, 1928, while Bielli was confined by illness in a hospital, the defendants procured him to execute the deed; that at that time he was sixty-four years of age; that "his mind was so affected that he did not know what he was doing"; that the defendants were aware of his impaired physical and mental condition; that he was not told by the defendants or by any other person the exact nature of the instrument tendered for his signature "but the nature of said instrument was concealed from him;" that no consideration moved from the defendants to Bielli; that within a week after the execution of the instrument Bielli died "without having recovered his

mental or physical vigor, and without knowing or understanding the nature of the instrument claimed to have been executed by him.'' Thus it is the theory of the complaint that when Bielli signed the deed he was not only physically ill but his mental faculties were so impaired that he was incapable of transacting business, and that the defendants, being aware of that fact, induced his signature after having concealed from him the nature of the instrument. The prayer prayed for a cancelation of the deed. The answer denied all charges of fraud and alleged that when Bielli signed the deed he was mentally capable of transacting business. It also alleged that the deed was founded upon a valuable consideration and that the transaction was fair throughout; we deem it unnecessary to review this pleading further. The decree of the circuit court was in favor of the defendants; plaintiffs have appealed.

We believe that the material question before us is the cogency of the proof. Due to the fact that the questioned deed was obtained from the deceased when he was lying ill in a hospital, upon what shortly developed was his deathbed, and due to the further fact that his early demise released the defendants from the further performance of the promises which constituted the consideration for the deed, and thus exacted of the defendants very little detriment, we have studied the evidence with painstaking care so as to determine whether the questioned transaction was fair and just, or was the result of any fraud upon the part of the defendants.

John Bielli, the deceased grantor, at the time of his death, was sixty-four years of age. He was a native of Italy and although he could neither read nor write the English language possessed an alert mind, could think clearly, was gifted with some natural shrewdness in

business transactions, and could scrawl his signature. In his early life he had been a laboring man but approximately twenty years ago acquired eighty acres of irrigated land situated several miles out of the city of Bend, worth about $4,000, upon which he conducted farming operations. Our present suit has as its subject-matter this tract of land. Bielli had also accumulated about $6,000 worth of securities consisting of liberty bonds, notes, mortgages, etc. He was a bachelor and resided in a small hut upon the aforementioned land to which the witnesses referred as a shack. He was a companionable individual and maintained very friendly relationships with all of his neighbors.

The defendants in this case resided upon an adjoining farm and had known Bielli for approximately ten years. The latter visited at the Mayer home in the evening generally two times a week and in addition made occasional Sunday visits. Mrs. Mayer often provided Bielli with food articles prepared by herself. Bielli had also become well acquainted with Charles Schlenker, another neighbor, whom he regarded as a good adviser, and to whom he resorted for the writing of his letters. Bielli's only living relatives, some nieces and nephews, resided in Minnesota; apparently none of them, with the exception of a niece, had displayed any interest in him.

About the middle of March, 1928, there developed on the back of Bielli's neck a carbuncle which refused to yield to the indifferent treatment which he administered to it. Finally it came to the attention of Mrs. Mayer (one of these defendants) who gave to it such ministrations as the gentle hand of woman was capable. But in spite of her efforts the carbuncle grew larger in size and more serious in its ill effects until, finally after

ten days of her treatments, it sufficiently affected Bielli's health that he was forced to remain in his cabin. About this time Mrs. Mayer began to bring him his meals as a neighborly act, and aroused the interest of Mr. Schlenker. When the latter discovered his friend's ill health he called a physician who removed Bielli to a hospital on March 28. April 5 Mr. Mayer visited Bielli in the hospital to inquire about his health. Before this visit had been concluded the later proposed that Mayer should lease Bielli's eighty acres of land during the term of Bielli's life, paying therefore $500 rental per year and also discharging all taxes, water charges, and similar items of expense so that the land would yield a net return of $500. Bielli also desired that the prospective agreement should require Mayer to maintain the place, its fences, etc., in good condition, and proposed that upon his death the land should belong to Mayer through the instrumentality of a deed to be placed in escrow simultaneously with the execution of a lease. Mayer promised that he would give the matter some thought, whereupon Bielli added that he had made a similar offer to another neighbor, Charles Williamson, and that if the latter did not accept the offer by one o'clock of the following day that he wanted Mayer to avail himself of it. Bielli was anxious that the transaction should be promptly concluded owing to the fact that there was work on the place which needed immediate attention. His proposal to Williamson contemplated that the annual rent should be paid in advance and that Bielli should have a home with the Williamson family. Williamson was indebted to Bielli upon a note for approximately $1,250; Mayer was almost free from indebtedness and had an income of $175 per month from outside employment. Upon Mayer's return home he discussed with his wife Bielli's offer and the two

decided to confer with him further before coming to a decision. After the evening chores had been performed Mr. and Mrs. Mayer called upon Bielli at the hospital; in the course of the discussion Bielli stated that he would like to make his home in a small shack near the Mayer home upon their farm and take his board with the family for a consideration of $25 a month. It developed that all of the foregoing was agreeable to the Mayers and thereupon the question arose how the transaction could be consummated; Bielli proposed that an attorney be employed to draft the necessary instruments. The name of H. C. Ellis, an attorney practicing his profession in Bend, and who had previously performed services for Bielli, was suggested. The proposal met with the latter's favor. The following day Mayer recounted to Ellis the terms of the contemplated agreement; the latter thereupon drafted a lease and the deed which is now being attacked. We shall refer to these instruments again, but for our present purposes it will suffice to state that the term of the lease was for the life of Bielli; it provided for an annual rental of $500, payable in semi-annual instalments; it required Bielli to deposit in escrow a deed to be delivered to the Mayers at the termination of his life; and provided that if the Mayers breached its covenants in any manner the deed should at once be returned to Bielli. These documents made no mention of board and lodging for Bielli. After they had been drafted Mayer requested Mr. and Mrs. Schlenker to be present when they were signed. On April 6 the two Schlenkers and Ellis called upon Bielli at the hospital and presented to him the lease and the deed. Neither Mr. nor Mrs. Mayer were present at this conference. After Schlenker had made some progress with reading the two instruments Bielli stated that it was unnecessary to read further and inquired whether

Schlenker was satisfied that the instruments were entirely satisfactory. Schlenker had previously known of Bielli's desire to dispose of the ranch upon terms substantially similar to those he offered to the Mayers. Schlenker not only replied in the affirmative to this inquiry but also explained in detail the terms of the deed and the lease. At the conclusion of his explanation Mr. Ellis added that the lease provided that if the Mayers did not faithfully discharge the provisions of the lease their interest in the property would at once cease and the deed would be returned to Bielli. The latter inquired whether the instruments made any mention of the fact that he could make his home upon the Mayer ranch, to which Schlenker replied in the negative; thereupon Bielli expressed his approval of that omission by stating that he was not sure that he would like to obligate himself to live with the Mayers. Apparently the explanations had satisfied Bielli and he thereupon proceeded to turn upon his side so as to attach his signature to the two documents. At this point Ellis, observing that the readjustment of Bielli's position might cause him some pain, suggested that he merely place his mark on the two instruments. When the mark had been placed Ellis and the Schlenkers departed and the following day Ellis completed the transaction by attaching his notarial seal to the papers and delivering the deed in escrow to the appointed bank.

We believe that the above narrative states the facts as they actually occurred. We have drawn our conclusions from the testimony of Ellis, the Mayers and the Schlenkers. Each, of course, did not participate in all of the foregoing incidents; nevertheless each described the event in which he took a part in substantial harmony with the testimony of the other participants. It is true that Mrs. Schlenker's account of what was said at the

hospital, concerning board, varies somewhat from the testimony of the other two witnesses, and that occasionally a witness became momentarily confused, upon cross-examination, but we nevertheless believe that all of these witnesses desired to tell the truth and that these slight variations, instead of impeaching the testimony show absence of rehearsal. The failure of Mrs. Schlenker to give the same account of the interview at the hospital as that related by her husband and Ellis may possibly be due to the fact that in her unfavorable position in the room she failed to correctly understand Bielli, who spoke English in a very broken manner. Moreover, since Schlenker and Ellis were the individuals who felt themselves charged with the responsibility of conducting this piece of business the conversation no doubt made a deeper impression upon their minds than upon hers. If the character of any of these witnesses had been impeached, or if the Mayers stood revealed as grasping individuals, or if the above account of the transaction was in any way contradicted, we would hesitate to subscribe to the foregoing conclusions, that Bielli proposed this transaction, that the contents of the papers were faithfully related to him, that he preferred to have the agreement for his board remain parol, and that his signature to the instruments was fairly obtained. But since the uncontradicted, unimpeached testimony is all to the above effect we accept it as the truth.

We come now to a consideration of the evidence which indicates the physical condition of Bielli at the time when this transaction occurred. As we have said before he was suffering from a carbuncle. The two physicians in charge of him described the size of it as reaching from the lower extremity of the skull to the muscles of the shoulders. It had caused the tissues in its

immediate vicinity to become putrescent and slough off so that the bones underneath could be seen. Upon other portions of his body there were two smaller carbuncles. Dr. J. C. Vandervert attended Bielli from March 28 to April 14, the time of his death, with the exception of one day when his brother substituted for him. Both testified that Bielli was suffering from general toxemia and that they believed his death from this illness was inevitable; Dr. J. C. Vandervert thought his death was a foregone conclusion from the day Bielli entered the hospital. Neither, however, acquainted Bielli with the seriousness of his condition until after a severe hemorrhage which reduced his strength and occurred three days after the execution of the deed. At that time the physician told Bielli that his condition was "critical." Nor did the physicians inform any of those who subsequently testified in this case, including the two nurses, that Bielli was in a serious condition. It is very evident that Bielli confidently expected to regain his health because he declared to some of his neighbors that they would soon see him upon the Mayers' ranch attending to their irrigating ditches. It had not occurred to the two nurses aforementioned that Bielli's condition was critical until the severe hemorrhage, aforementioned, had occurred. The Mayers and Schlenkers testified that they had no idea that Bielli was seriously ill. Due to the bandages, placed by the physicians and nurses, Mrs. Mayer and Schlenker did not see the carbuncle again after Bielli had entered the hospital.

██ We come now to a consideration of the evidence revealing Bielli's mental condition. The two physicians described it as subnormal and added that narcotics were constantly administered to him for the purpose of relieving pain. They explained that at times he was delirious, almost always incoherent, and most of the

time unconscious. A third witness thought Bielli "wasn't in his right mind." All three agreed that when they entered his room he recognized them. Although Dr. Vandervert believed that Bielli was incapable of transacting business, the two nurses had not discovered any fact which made them feel that his mind was affected. However, since they experienced difficulty in conversing with Bielli, due to his imperfect English, their testimony is not as persuasive as that of his neighbors who had for several years displayed a commendable, friendly interest in him, and who had not noticed any change in his mental condition. They testified that he recognized them promptly as they entered the room, engaged them in lively conversation, recalled past events and inquired concerning the progress which they were making with their farming operations. Of one neighbor Bielli inquired whether he had purchased an adjoining tract of land in consummation of past negotiations; with two others he concluded a transaction for the renewal of two promissory notes; a third he sent to the bank to cash a check; another purchased some oranges for him; and from some others he gratified a desire for fresh eggs. The renewal of the aforementioned notes, which was a somewhat complicated matter, was consummated after the Mayer transaction had been concluded. The doctors did not specify whether Bielli's mind had become subnormal and lacked the capacity to transact business in the vicinity of April 7, or whether it had deteriorated only after the above mentioned hemorrhage, which all agree greatly weakened Bielli. It seems to us that they were persuaded to their conclusions by the application of the premise that as the physical health fails so does the mind in equal proportion. Their testimony is devoid of incidents and was given in the form of broad conclu-

sions. After a painstaking examination of the evidence and a comparison of the testimony of the witnesses we are firmly of the opinion that when the transaction between Bielli and the Mayers was concluded the former's mind was fully capable of transacting that piece of business. We deem it unnecessary to once more cite authorities in support of the rule that neither age, sickness nor debility of body will affect the capacity to make a contract or a conveyance if enough intelligence remains to understand the transaction.

After the transaction had been concluded Bielli repeatedly referred to it in the course of conversations with others wherein he expressed his entire satisfaction with it and also showed that he was thoroughly familiar with its import. Thus he told one neighbor: "If I die tomorrow the place is Joe's" (Mayer's) and later added: "I give the Williamsons a chance but he never showed up. The Mayers going to take care of the John (Bielli) now, going to get the ranch and take care of the John * * * John feel so glad." Much other testimony to like effect appears in the record. The conclusion is inescapable that Bielli realized fully the nature of the transaction which he had concluded and was entirely satisfied therewith.

Another circumstance, which in our opinion tends to support the validity of this deed, follows. The transaction which the deceased concluded with the Mayers was the consummation of a plan over which he had pondered for many months; in fact, for years. He had worked out carefully all of its details and had submitted several offers to other neighbors. We have already referred to the testimony of Schlenker, and to Bielli's offer to Williamson. According to the testimony of C. E. Dickey, another neighbor, Bielli had

offered him a somewhat similar lease about six years prior to his death. Shortly before entering the hospital Bielli had attempted to sell his farm for $6,000. We quote from the appellant's brief:

"For several years Bielli had realized that his physical condition would not permit him to properly do the necessary work upon his ranch, and had evidenced a desire to dispose of it. From all of the testimony taken in the suit it appears he wanted a certain net annual or semi-annual cash rental or payment for the property, and a home with the purchaser or tenant. In return he would give to the purchaser or tenant the use of the ranch during his life, and would provide for the delivery of a deed at his death."

It is true that in his previous offers Bielli had always insisted upon an advance payment of part of the rent. The four following facts may have persuaded him to forego this condition in the instant case: (1) Mayer's financial responsibility and assured income; (2) the fact that Bielli found himself in the hospital unable to discharge the accumulating work which required attention; (3) the fact that he would probably be able to secure employment with Mayer, and (4) his past satisfactory relations with both of the Mayers. The agreement in regard to board and lodging was not placed in writing but it cannot be doubted that the parties came to an understanding upon that matter. Bielli even inquired how he could obtain his meals when Mrs. Mayer "had company"; he was assured that upon such occasions his meals would be served in the cabin. The evidence certainly does not disclose that he had decided that the agreement for his board and lodging must be included in the deed, lease or some other writing. We conclude that the transaction as consummated was in substantial accord with a plan previously determined.

Having effected the above contract with the defendants Bielli promptly placed them in possession of his ranch. This conclusion is justified by the fact that he disposed of all of his personal belongings upon the ranch. For instance he endeavored to sell to Mr. Mayer a harrow, but finding that Mayer already had such an implement he disposed of it to another neighbor. He sold his chickens to another friend and in like manner promptly sold or gave away all of his personal property so as to give the Mayers immediate possession of the ranch unencumbered with any of his belongings.

Since Bielli believed, as he did, that he would recover, it was very natural for him to effect this transaction. He had reached the age of sixty-four, and had suffered recently some disabilities which rendered it desirable for him to free himself of the hardships of farm life. He had also become persuaded that he did not owe his relatives the preservation of the farm as an inheritance; thus he declared: "My relatives never done anything for me." Since he was keeping a string upon the title to the ranch, and obtaining from it a net income of $500 per year the transaction was in harmony with his idea, frequently expressed, "The farm will have to take care of the John." The fact that last year's crop of potatoes had not been profitable and that he could probably find employment with Mr. Mayer rendered the transaction even more desirable.

Next it will be observed that the offer to the Mayers came exclusively from the volition of Bielli. It is a case where the grantor sought out the grantee and made the offer upon his own initiative.

Further sustaining the transaction are the circumstances: (1) the Mayers were not present when the documents were explained to Bielli and received his sig-

nature; (2) Schlenker, Bielli's trusted friend, Mrs. Schlenker and an attorney with whom the deceased had consulted upon previous occasions were present and advised him; (3) in the three days that elapsed from the offer to the final conclusion of the transaction Bielli received visitors of whose counsel he could have availed himself. The appellants argue that since Mayer requested Schlenker to be present the latter was the agent of the former. Schlenker, however, testified that he performed this errand as a friend of Bielli, like he had served the latter on many other occasions. The record discloses no close relationship between Schlenker and Mayer whereby the former would be likely to act as the agent of the latter in opposition to his old friend Bielli. We believe that the plaintiff's contention is not supported by the evidence.

■ We are of the opinion that the transaction was founded upon a fair consideration. The value of the ranch did not exceed $4,000. The lease, in addition to exacting of the Mayers payment of the annual rent of $500, required them to discharge the taxes, water assessments and cost of maintenance. Bielli, being sixty-four years of age, had a life expectancy of eleven and sixty-four one-hundredths years. Hence the obligation which the Mayers assumed might have become burdensome. Of course if the time for Bielli's death had already been selected for one week hence, when the deed was executed, the burdens which the Mayers assumed were inconsequential. However, we notice that before Bielli entered the hospital he was described as a "husky" individual. Since we find no ground whatever for drawing an inference that the Mayers knew that Bielli was on his death bed we conclude that the above promises constituted a fair consideration for the benefits which the lease promised.

 Having reached the above conclusions it follows that in our opinion the transaction was free from fraud, undue influences and overreaching. Even if the burden rested upon the defendants to rid this transaction of all suspicions of fraud the duty has been performed. Courts of equity should always be vigilant to discover fraud and should carefully scrutinize any transaction consummated upon a deathbed to the enrichment of the surviving contracting party. But when no fraud has been discovered and it appears that the alleged wronged party possessed the normal capacity of his mentality, and consummated the transaction in a manner that was agreeable to his own wishes it is the duty of the court to uphold it.

 We come now to the contention that the minds of Bielli and the Mayers had never fully met and that hence the writings lacked legal significance. This contention assumes that the evidence proves (1) that Bielli intended to exact prepayment of the rent in a manner similar to his proposals to others, and (2) that he contemplated that there should be included in the written instruments a provision for his board and lodging. The disposition of this argument is dependent upon the view which one takes of the evidence. We find nothing in the record which indicates that Bielli intended to exact of the Mayers any prepayment of the rent. The premises of this conclusion have already been stated. After giving the matter much thought we believe that Bielli did not intend the writings to include a provision for his future board and lodging. Schlenker's testimony is not contradicted and is to the effect that Bielli desired the agreement upon that subject to be omitted from the lease. Apparently past favorable experiences with the Mayers extending over many years, which included the loaning of money back and

forth, satisfied him that he could trust the oral promise of the Mayers to provide him with board and room if he wished. In fact, the common experience of mankind possibly teaches us that as a practical matter a written promise for a service as personal as board and lodging is no more valuable than an oral one made by a person morally responsible. The parol evidence rule would not have excluded proof that a part of the consideration for the deed was a promise upon the part of the Mayers to provide board and lodging for the grantor: *Brown v. Cahalin,* 3 Or. 45; *Watson v. Smith,* 7 Or. 448; *Houston v. Greiner,* 73 Or. 304, (144 P. 133) ; *Savage v. Scroggin,* 83 Or. 51, (162 P. 1061) ; Devlin on Real Property (3d Ed.) § 807.

■ There remains for disposition only the argument that the promises which the parties exchanged, and which constitute the consideration of the contract lacked mutuality. The plaintiffs contend that the promises of the defendants were unenforceable due to the following stipulation in the lease :

"That in case said parties of the second part (defendants) shall fail or neglect to pay the rental aforesaid, or any part thereof, or shall fail to keep or perform any of the foregoing convenants or agreements on their part to be kept and performed, then this lease shall immediately become null and void and the deed above mentioned shall be returned and surrendered to the said party of the first part."

Other provisions of the lease stipulated that the defendants should

"pay all taxes, water maintenance and assessments that may be legally levied against said premises during the life of this lease and that they will cultivate said land in a husbandmanlike manner and in accordance with the best practice of local agriculture ; that they will

keep all fences, ditches and other improvements in at least as good state of repair as they are now in, all at their own expense.''

The merits of this contention depend upon a construction of the lease. We do not believe that the above language was intended to cancel the liability of the Mayers for any accumulated rent. In other words the parties did not intend that a default in the payment of rent, taxes or other charges constituted a satisfaction of sums already due. Nor did they intend that a return of the deed discharged accrued liabilities. Having interpreted the language in this manner it follows that the promises of the parties were mutually enforceable.

The decree of the circuit court will be affirmed; costs and disbursements will be allowed to neither party.

KELLY, J., did not participate in this decision.