Argued October 12; affirmed as modified November 8, 1949

# LEGLER ET AL. *v.* LEGLER
### 211 P. 2d 233

*B. G. Skulason,* of Portland, argued the cause and filed a brief for appellant.

*Lloyd V. Weiser,* of Portland, argued the cause for respondents. With him on the brief was C. C. Hall, of Portland.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, BAILEY and HAY, Justices.

ROSSMAN, J.

This is an appeal by Vernie K. Legler, one of the defendants, from a decree of the Circuit Court which cancelled a deed that her husband, George Legler,

signed February 6, 1947, three months prior to his death, and which conveyed to her a half interest in a city lot which we shall later describe. Immediately prior to the delivery of the deed, George Legler was the sole owner of the lot. The deed, which evidently was patterned upon the provisions of § 63-210, O. C. L. A., expressed a purpose to create an estate in entirety between husband and wife. We may hereafter refer to Vernie K. Legler as the appellant and to her deceased husband as Mr. Legler. The latter died testate May 5, 1947, at the age of 88 years. The attacked decree held that Mr. Legler, at the time of signing the deed, was incompetent and the victim of undue influence. It cancelled the deed.

The plaintiffs, who are now the respondents, are three in number. One of them, Margaret Legler Anderson, was the daughter of Mr. Legler. The other two, George A. and Fred W. Legler, were his sons.

The complaint alleges that when Mr. Legler signed the deed he was ''of the age of approximately ninety years, and was unsound of mind to such an extent as to be wholly incapable of transacting his own business, and never to the day of his death knew that he had made such a deed.'' It also says: ''The said Vernie K. Legler paid no consideration for said deed, * * * and taking advantage of her close and intimate relation with her said husband, and by the exercise of undue influence, procured him to execute and deliver said deed to her without the knowledge of the plaintiffs and other defendants herein.''

April 11, 1936, when Mr. Legler was a widower, 77 years of age, and the appellant was 41, they were married. The children whom we have mentioned were the offspring of Mr. Legler's first marriage. At the

time of the second marriage Mr. Legler owned and was living upon a ranch in Eastern Oregon which was worth about $7,000 or $8,000. The ranch is not affected by this suit. In the same year he inherited a city lot located at the intersection of Northeast Twenty-seventh Street and Sandy Boulevard in Portland. That lot, to which we shall refer as the city lot, is the subject matter of this suit. It is improved with a store building and a small dwelling house. At one time Mr. Legler owned another item of property, but parted with it prior to his death. At the time of his decease he owned only the city lot and the ranch.

A few moments before Mr. Legler signed the attacked deed he executed a will. The respondents do not challenge it. Both instruments were drafted by Mr. Bruce Cameron, an attorney whose offices are in Portland. Since the two instruments were prepared simultaneously, we shall mention briefly the will. It devises the ranch as follows: To the son Fred, a one-third interest; to the daughter Margaret, a one-third interest; and to the children of the son George, the remaining one-third. The appellant swore that her husband intended to devise to her an interest in the ranch, but that she dissuaded him from so doing under a belief that the ranch should descend to his children. We shall presently mention other provisions of the will. If the deed is valid, § 63-210, O. C. L. A., renders the appellant the sole owner of the city lot. If the deed is invalid, and if the appellant elects to accept under the provisions of the will, there will be applicable the residuary clause of that instrument which devises to her a one-fourth interest in the residue which will consist of the city lot. The same clause devises to the testator's son Fred a one-fourth interest; to his

daughter Margaret a one-fourth interest, and to the children of his son George the remaining one-fourth. We mentioned the fact that the respondents do not challenge the will, although its execution was almost coincident with that of the deed. Mr. Legler had executed a previous will on May 31, 1939, when his competency was conceded, which expressly mentioned the Sandy Boulevard property and directed that it "be sold as soon as advisable and divided one-fourth (1/4) to my wife; one-fourth (1/4) to my son, Fred Legler; one-fourth (1/4) to my daughter, Margaret Legler Anderson; and one-fourth (1/4) to my grandchildren, the children of my son, George A. Legler, in equal portions as herein provided." It is seen that the provision just quoted makes substantially the same disposition of the city lot as the residuary clause of the will which was signed February 6, 1947.

Sometime after the second marriage and the receipt of the devised property, the Leglers moved to Portland and took up their residence in the cottage we have mentioned.

■ Before considering the testimony which bears upon the deceased's competency, we deem it material to take note of the fact that uncontradicted evidence indicates that the deceased had long planned that the city lot, or at least a substantial interest in it, should go to his children upon his death. We shall briefly review the evidence upon that subject. Since the contested deed is testamentary in character, other instruments which he had signed previously when his competency was unchallenged were admissible in evidence for the purpose of showing that he had long formed a plan for the disposition at death of the city lot. See Wigmore on Evidence, 3d Ed., § 112, and annotation 82 A. L. R. 973.

E. C. Mattson was the tenant of the city lot. As nearly as we can determine, he had no interest in the outcome of this suit. He testified that upon an occasion when he informed Mr. Legler that he would like to purchase the property, Mr. Legler "told me he was saving it for his son, and he brought him into the shop sometime later and introduced me to him and said that in the event of his death that he would get the property and I would, no doubt, be able to deal with him." Fred W. Legler, who had always been on cordial terms with his father, testified: "When he (the deceased) introduced me to Mr. Mattson, he said, 'There is the man that you will have to deal with when I am gone.'" Upon another occasion, according to Fred, "He told me that she was—wanted him to sell that property but he wouldn't do it because he wanted to keep that for his children and that—he told me that was the reason why he leased it to this present tenant, was to keep her from selling it." By "she" and "her" he meant the appellant. Mrs. Mabel Miller, the mother-in-law of Fred Legler's son, swore: "Mr. Legler told me that his wife wanted to sell the property on Sandy, but he didn't want to sell it; that he had it leased to a good man and he had promised to lease it to him as long as he lived. And he said, 'After all, I have kids of my own that I want to have that property.'" In the same year that Mr. Legler acquired the property in question he executed a will (September 21, 1937) which devised to Fred Legler a one-sixth interest in the lot in question, another one-sixth to his daughter Margaret, a half interest to the appellant and the remaining one-sixth to the children of his son George. We have already mentioned the provisions of the will of May 31, 1939, and of the one executed immediately

preceding the execution of the deed. By way of summary, it thus appears that the will of September 21, 1937, disposed of the city lot as follows:

| | |
|---|---|
| Appellant | 1/2 |
| Fred | 1/6 |
| Margaret | 1/6 |
| The children of George | 1/6 |

The will of May 31, 1939, disposed of the same property as follows:

| | |
|---|---|
| Appellant | 1/4 |
| Fred | 1/4 |
| Margaret | 1/4 |
| The children of George | 1/4 |

The will of February 6, 1947, disposed of the property as follows:

| | |
|---|---|
| Appellant | 1/4 |
| Fred | 1/4 |
| Margaret | 1/4 |
| The children of George | 1/4 |

Discord existed between Mr. Legler and his son George and that fact, presumably, accounts for the substitution of George's children for their father in the provisions of the will. We see from the foregoing evidence that Mr. Legler always intended that Fred, Margaret and George's children should have a substantial interest in the city lot. Only the challenged deed indicates a different purpose.

August 20, 1946, Mr. Legler suffered a severe stroke of paralysis. Dr. John B. Welch, who attended him, termed the stroke a "cerebral vascular accident", and explained, "He had complete placid paralysis of the left side." His testimony shows that the decedent's right side was also involved although the paralysis in that area later disappeared in large part. Following

the stroke, Mr. Legler was placed in Providence Hospital in Portland where he stayed until September 18, 1946, when he was taken to his home. He died May 5, 1947.

After the stroke of August 20, 1946, Mr. Legler was completely bedfast, with the exception of one occasion when a neighbor placed him for a short time in a wheel chair. Accompanying the stroke was an attack of pneumonia, but medical care overcame that phase of the illness. We mentioned the fact that at the outset Mr. Legler's right side was affected by the stroke and that later he regained to a large extent the use of that side. However, he never fully recovered the use of his right arm, as was evidenced by the fact that he could not feed himself.

The main issue concerning the decedent's condition is this: Did the stroke affect Mr. Legler's physical condition only or did it also affect his mind. The disabling effect upon his physical condition is admitted. The appellant claims, however, that her husband's mind was not impaired by the stroke.

Much of the evidence which the respondents presented indicates that after the stroke Mr. Legler could not speak or in any other manner communicate his thoughts, if he had any. They concede, however, that when he had had enough food he so indicated. From various circumstances, including the purported one that he uttered no words, the respondents infer that his brain had lost its capacity to function. The appellant denied that her husband was unable after the stroke to speak. In partial explanation of the evidence which the respondents introduced, she explained that (a) Mr. Legler, who was born in Switzerland, spoke broken English, and (b) after his stroke he could not use his

dentures and their absence from his mouth impaired his enunication.

Many of the witnesses swore that after the stroke Mr. Legler was incompetent. They testified that he could not talk and that he lay inert in his bed. These witnesses heard him occasionally utter sounds, but averred that the sounds were meaningless. Most of them thought that he failed to recognize visitors even after their names had been repeatedly told him. They said that he looked at his visitors, followed them with his eyes as they moved around the room, but said nothing and gave no indication that he recognized anyone. According to them, they were unable to discern any indication that thought was going through his mind. The uncontradicted evidence of Dr. Welch shows that Mr. Legler's tongue was not affected by the stroke and that he freely moved his lower jaw. From those circumstances, it seems reasonable to infer that his failure to speak, if such was the case, was not due to a defective tongue or lower jaw, for those members escaped the devastating effects of the stroke.

We shall now mention the witnesses whose testimony is condensed in the preceding paragraph. One of them was E. C. Mattson. As we have said, nothing was disclosed concerning this witness indicating that he had any interest in the outcome of this case. Prior to the stroke he had seen Mr. Legler frequently and the two men were fond of each other. During the illness he saw Mr. Legler "two or three times." He expressed the opinion: "He was incompetent, I can truthfully say." When he visited Mr. Legler the latter said nothing and indicated only in equivocal form whether or not he recognized his visitor. When Mattson spoke to Mr. Legler he got no response. Although the monthly

rental checks which he issued were payable to Mr. Legler, he being the sole lessor, they were not endorsed by him after the stroke. That circumstance possibly indicates that he had lost the ability to sign his name.

Margaret Legler Anderson, the daughter of the decedent, whose home was in Alaska, came to her father's bedside in August following the illness and remained in Portland until December 6. The residuary clause of her father's will bequeathes to her a one-fourth interest and, accordingly, she is interested in the outcome of this suit. Mrs. Anderson assisted the appellant in caring for their patient. She swore that her father did not recognize her after his illness and that upon an occasion when she returned to him after an absence of a week, he "took me just as a matter of course" and gave no indication that he knew she had been gone. Further, she testified that when the appellant left the home for a week her father "didn't seem to miss her and didn't ask about her or anything." We quote from another part of her testimony: "I think he muttered," but she described his sounds as meaningless. She thought, however, that when her father had been plied sufficiently with questions or had been asked whether he had been fed enough, he occasionally answered by a nod of the head or in some other manner. She expressed the belief that her father was "incompetent to think for himself." We quote again from her testimony:

"Q. Did you ever see him write?
"A. Oh, no, not after he was ill."

Dr. Welch apparently had no interest in the outcome of the case. Evidently he had been employed by the appellant, but the respondents called him as a witness. He was a general practitioner whose competency

was conceded. He testified that Mr. Legler's family told him that he had had a slight stroke five years before the fatal one. Dr. Welch never entertained a hope for the recovery of his patient and had so told the appellant. According to him, his patient while in Providence Hospital "had not spoken." He added that "prior to his discharge, when I would see him in the hospital, I think I can definitely say that from the appearance of his face or his eyes, he seemed to recognize me." He saw Mr. Legler several times after his discharge from Providence Hospital and, referring to those occasions, testified: "I couldn't understand anything that he said." He thought possibly the appellant, who was constantly with her husband, interpreted some of the sounds. We again quote from his testimony:

"Q. From your observations and treatment of him, doctor, and his conduct, did you have—would you say he was competent or incompetent during that period of time?

"A. Since I hadn't known the patient prior to his cerebral vascular accident, and due to the fact that he hadn't spoken to me or answered questions after the cerebral vascular accident up to his death, though it appeared at times that he definitely recognized me, I don't feel that one can definitely give an opinion as to his mental incompetency or competency."

He swore that his patient could make nothing but "gross" movements with his right arm and explained that gross movements are not fine movements but consist of such actions as a handshake. We now quote from his cross-examination:

"Q. You are not prepared to say that on that date he didn't understand what he was doing, if he signed a deed or a will on February 6, 1947?

"A. I think, to be able to state whether a man is mentally competent or not, in my opinion, that man would have to—for me to make an opinion of his mental competency, I feel that that man would have to be able to talk to me or at least let me know in some way that he was comprehending everything; and under the cricumstances that Mr. Legler was in, he was unable to talk to me at any time. He did make noises, I grant that, but those noises I couldn't understand myself. So I feel, to give an honest opinion as to the state of his mind to this court, I don't believe I could give a strictly honest opinion, because I had no way to judge it.

\*   \*   \*

"Q. And his mind was alert—I won't use that word—but his mind was functioning, wasn't it, all the time while you knew him?

"A. That I couldn't say, whether his mind was functioning or not.

"Q. If you asked him a question and he indicated that he understood the question, that would indicate his mind was functioning, wouldn't it?

"A. When I asked him a question he didn't indicate in any way, except as I stated previously, that by the appearance on his face and in his eyes I would have the feeling that he was understanding at least some of what I asked.

\*   \*   \*

"Q. \*   \*   \* Do you think that he would have been able to write?

"A. In my opinion, he would have had great difficulty writing."

Dr. Welch expressed the belief that the paralysis which affected his patient "wouldn't necessarily" affect his mental faculties.

Dr. D. C. Burkes is a physician who specializes in the treatment of nervous and mental diseases. His competency was conceded. Dr. Burkes had never seen

Mr. Legler, but heard the testimony given by Dr. Welch. Based upon it, Dr. Burkes testified:·

"A. It is my impression sitting here that there is—listening to the testimony—that this man had had a hemorrhage, because he had had a previous history of a somewhat similar incident. The degree of mental competency would depend a great deal upon the extent of the hemorrhage, the residual, the result of the hemorrhage. I understood Dr. Welch to say that he had paralysis of the entire left side and for. a time the right side was partially involved, particularly the leg; that is the way I understood his testimony. At the age of 88 or 89 there is naturally a lowering of the entire mental function, mental field. That lowering, within itself, doesn't mean that he would be incompetent; but considering his illness, a stroke plus a pneumonia plus a loss of speech plus paralysis of his left side plus his ability to—inability to comprehend what is being said to him other than by an occasional movement of the eyes or perhaps a nod, and plus the fact that Dr. Welch said he had only gross movements in the right hand, I would say that there had occurred sufficient damage through degeneration of brain cells and the hemorrhage, that it would be very likely that the man would be competent to transact business.

"Q. You mean competent or incompetent?
"A. Incompetent.

*    *    *

"Q. Well, doctor, you wouldn't say that that sort of lesion would necessarily impair the mental faculties?

"A. In that age individual we would think that it would more likely do that than it wouldn't do it.

"Q. Yes, but not necessarily. It isn't an inevitable result of a lesion that the mind is affected?

"A. No, I suppose it isn't inevitable. We certainly would expect it in the majority of cases.

"Q. This man—you are testifying now on the basis of Dr. Welch's testimony—this man might have understood what property he owned and what he wanted to do with it?

"A. There was nothing said on the witness stand this morning that would make me feel that he did.

\*   \*   \*
\*   \*   \*

"Q. You don't think that he knew what he was doing if his property was discussed and he was asked what he wanted to do with it, whom he wanted to get this—

"A. In view of the testimony this morning, I would say definitely not. I don't see how he could have.

\*   \*   \*

"Q. \* \* \* whatever happened to his brain wouldn't necessarily foreclose his ability to use his mind, would it?

"A. That is rather difficult to say to what—in what percent that would happen, but we would expect it in the majority of cases. I presume it is possible for a man to have a cerebral accident and still maintain his mental capability, but it is unusual and I don't recall ever seeing it.

"Q. You can't apply a general rule to those cases?

"A. I am applying a general rule to a man almost 90 years of age, but there are exceptions to everything, I presume.

\*   \*   \*

"Q. Is it your opinion, then, that on that day that he would have been incompetent?

(Colloquy)

"A. From my previous experience with individuals his age, suffering a cerebral accident to the extent that his apparently existed, and in view of what Dr. Welch said here this morning, it would be my opinion that he was incompetent at the time, that he was not competent."

Fred W. Legler, son of the decedent, is a beneficiary of the will and, hence, interested in the outcome of this case. He visited his father four or five times after the stroke and upon at least one of the visits was accompanied by his wife. According to him, his parent recognized neither him nor his wife. The witness explained that his father "looked at me" and had "a blank look" upon his countenance. The decedent, so this witness testified, "mumbled" something which was incoherent. Fred expressed the belief that his father was "incompetent." The witness' wife gave testimony similar to her husband's. She added that she and her husband tried to engage the decedent in conversation but got no response, not even a nod of the head.

C. M. Legler is a son of Fred Legler and prior to the stroke had seen his grandfather frequently. He is not a benificiary of the will. He visited his grandfather in the hospital in August and at his home December 7. Concerning the first visit, he said:

"He recognized me after a while. They told him, kept telling him who was there to see him and who it was, that he finally recognized me, but he didn't talk to me or anything."

When asked how the recognition took place, he answered: "He put his hand out to shake hands." In the course of the visit of December 7 he saw nothing indicating that his grandfather recognized him. He term his grandfather "incompetent, absolutely."

Mrs. C. M. Legler is the wife of the witness just mentioned. Her testimony was similar to her husband's. She added that the decedent lay inert in the bed.

Mrs. Mabel Miller is the mother of Mrs. C. M. Legler. She accompanied her daughter and son-in-law

upon the visit of December 7. She had seen Mr. Legler many times prior to his illness. Concerning the visit of December 7, she said that Mr. Legler was "lying there practically helpless. He didn't recognize anyone." She explained that he engaged in no conversation. According to her, efforts were made to make Mr. Legler understand the identity of his visitors but the efforts failed.

We come now to the testimony given by the appellant and her witnesses. The first witness produced by the appellant was Mr. Bruce Cameron, the attorney who drafted the challenged deed and also the will which we have mentioned. Mr. Cameron was unacquainted with Mr. Legler prior to the latter's illness. He saw him only twice. Both visits occurred after the stroke and both took place in the decedent's home. The first visit occurred January 24, and the second February 6, 1947. The two visits were concerned, not only with the deed, but also with the will. Referring to Mr. Legler, he said:

> "He could talk, Mr. Hall, after a fashion. * * * He told me the names of his children. He called Fred by his name; he didn't know the names of his grandchildren, * * *. His talk and his speech was impaired. * * * I asked him the names of his children and he gave me the names of some of them. Some of them I couldn't understand. I asked Mrs. Legler once, I said, 'Will you come in here, please? He is trying to tell me something. What is he saying?'"

In trying to ascertain Mr. Legler's wishes, Mr. Cameron was aided by a will that the decedent executed in 1937 and which the appellant handed to him (the witness) and also by the lease covering the store building. From those documents Mr. Cameron obtained the de-

scriptions of properties, the names of heirs and other information. We again quote from Mr. Cameron's testimony:

> "Let's put it this way: That there were several statements that he made were interpreted by his wife and he in turn acknowledged that that is what he meant."

In the following testimony Mr. Cameron explained further how he got information from Mr. Legler:

> "A. He communicated with me to a degree. He would give me enough information, enough inkling of what he wanted and then by a matter of trial and error—I was there for a considerable length of time—by a matter of trial and error I finally obtained from him the information as I thought he was trying to convey to me.
>
> \* \* \*
>
> "Q. He was too ill to just relate what he wanted, was he?
>
> "A. Well, he wasn't talking as you and I are.
>
> "Q. You asked him the questions and then he indicated yes or no by a nod of the head or grunt, and which you interpreted, is that right?
>
> "A. No; now let's not go that far.
>
> "Q. Tell the court exactly how far we do go.
>
> "A. No, Mr. Hall, He would indicate to me—he talked some, but a lot of it was by trial and error on my part."

Before signing his name to the contested deed, Mr. Legler, according to Mr. Cameron, "fumbled" and muttered something which he could not understand but which Mrs. Legler interpreted as a request for his glasses. A search was instituted but the glasses were not found. Without his glasses Mr. Legler could not

read. In explaining how the deed was signed, the following testimony was given by Mr. Cameron:

"A. He attempted to make his signature and his hand was very shaky.

"Q. How did he manage to sign the deed with his shaky hand?

"A. He grasped the pen and held it rather firmly. I guided his hand and showed him on the paper where to sign his name. * * * And he put his hand down close to where he was and signed it, and I moved his hand a little bit back and forth, * * *."

When asked for his opinion "as to the competency of the man to execute the deed or the will," Mr. Cameron answered:

"I am certain that at the time of the execution of the will and at the time of the execution of the deed that Mr. Legler knew exactly what he was doing and was having done exactly what he wanted done."

Later, he added:

"There is no question in my mind, Mr. Hall, but what he knew what his properties were."

The appellant swore that her husband recognized her and engaged in conversation even while he was in the hospital. She claimed that he improved "definitely" as the days went on. She granted that some of his words were "delirious talk" but described others as "quite clear." She illustrated the latter with the following:

"I remember one incident especially: His grandson, Margaret Anderson's son, came to visit him in the hospital, with his wife and small baby, and my husband said, 'Will you hold the baby up? I would like to whistle to him.' They held the baby up and my husband whistled to the baby, and he knew who

those people were and knew they had the baby with them. That was before he left the hospital."

According to her, her husband conversed with all of his visitors. For instance, she said:

"Yes. He spoke to other people; he spoke to his children when they came to the house, many times. He even sung for me, in fact. He used to sing German songs and I asked him to sing for me a couple of times, and he lay there in bed and sang for me."

We quote again from her testimony:

"Q. Did you understand him when he talked?

"A. Yes, I did. Mr. Legler spoke brokenly. He was Swiss and spoke German, and he had never been able to wear his dentures after the stroke. Naturally it would be difficult for some people to understand him; but I understood Mr. Legler all during his illness, and he would talk to me."

Mrs. Emmy A. Betz, secretary to Mr. Cameron, accompanied him to the descendent's home February 6 when the deed and the will were signed. Referring to that occasion, she testified:

"He looked very bright and he smiled and acknowledged us, * * *. He seemed very eager, I have never seen an ill person show so much eagerness and want to get up and help and sign the papers; and he assisted and co-operated all he could. * * * And after he had done that, Mrs. Legler came in the room and he smiled very sweetly at her."

She swore that after the papers were signed, "Mr. Cameron asked him if everything was the way he wanted it and he smiled and said 'You bet you,' with spirit." According to her,

"I couldn't understand him too well. I just— I could understand what he was trying to say but I couldn't understand every word."

The following is taken from her examination:

"Q. He was a very bright man?

"A. That is true.

"Q. And he knew exactly all about what property he was conveying?

"A. Yes, he seemed to, yes, he did.

"Q. And he knew all about who the children were?

"A. Yes, he did.

"Q. And he called them by name?

"A. Yes.

"Q. And he could also—knew which properties he had?

"A. He seemed to, yes, as Mr. Cameron explained it.

 * * *

"Q. How did he recognize them?

"A. Mr. Cameron read them to him and said— I don't recall his exact words.

"Q. What I want is Mr. Legler's words.

"A. Well, he nodded and said yes and answered Mr. Cameron's question, that is all.

"Q. In other words, he said 'yes' to everything in the will, didn't he?

"A. Yes, he did.

"Q. Yes. He read him the will and he said 'yes' to everything in the will?

"A. Yes, he did.

"Q. Did he say 'no' to anything?

"A. I don't recall that he did."

On direct examination she was not asked concerning the competency of Mr. Legler, but upon cross-examination she declared:

"He was definitely not incompetent."

Then she was asked:

"He also seemed to be quite smart?"

and answered:

"Yes, he did."

She had never seen Mr. Legler prior to February 6 when the deed was executed.

Mr. Floyd E. Burton is a brother of the appellant. He became acquainted with Mr. Legler at the time of his sister's marriage. He saw his brother-in-law at least once a week during the period of his illness. According to him, "He knew me every time that he was awake when I went over there." Mr. Burton testified that Mr. Legler also recognized the witness' son whenever he accompanied him upon the visits. Going on, the witness testified:

"He talked to me, he knew what he was talking about, and the conversations we had were always rational, and everything."

The subjects of the conversations were such items as gardening and the weather. The witness admitted, "I did most of the talking," and added, "I tried to entertain him, but he would say 'yes, I know.'" We quote further from his testimony:

"Q. Is there any question in your mind as to his competency to sign a deed?
"A. No, sir.
"Q. Or sign a will?
"A. No, sir."

The witness admitted that Mr. Legler did not talk "as plain" as before his illness, but added that he understood "nearly everything that was said."

Mrs. Stella Watson is a sister of the appellant and of the witness just mentioned. She became acquainted with Mr. Legler when he married the appellant. According to her, she and her husband called upon the decedent when he was in Providence Hospital. She described the visit thus:

> "My husband and I walked in, there was no one else there in the room at the time, and I said, 'Do you know who is here to see you, George?' and he said, 'It is Bob and Stella.'"

After Mr. Legler left the hospital she saw him frequently and thought that he improved, but conceded that she never conversed with him, even when she fed him during absences of her sister.

Robert D. Watson is the husband of the witness whose testimony we have just reviewed. He saw Mr. Legler "quite frequently" after his illness, and testified that when he and his wife called upon him in the hospital they were recognized. At that time some conversation took place, so he swore. When asked, "He could talk, then?" he replied, "Oh, yes." After Mr. Legler returned to his home he showed such marked improvement, so this witness swore, that "It looked to me like there might be a possibility that he would throw off the effects of the stroke." When Mr. Watson made visits to Mr. Legler's home following the return from the hospital he spoke to him and the conversations were "quite similar to the way usually he had spoken." He believed that Mr. Legler, in February, 1947, was competent to transact business.

Those whom we have mentioned were all of the witnesses. It will be recalled that before Mr. Legler signed the proffered papers he fumbled and muttered something which the appellant interpreted as a request

by her husband for his glasses. It will also be recalled that the ensuing search failed to find the glasses. The appellant testified:

> "I later found them in the coat he had had—just before the stroke."

The stroke occurred August 20, 1946, and the signing took place February 6, 1947. It is conceded that Mr. Legler could not read without glasses. Accordingly, he had not had his glasses and had read nothing in the period of five and one-half months preceding the signing of the papers. That fact possibly lends some support to the contention that his mind was impaired.

Before leaving the subject, we will revert to Mr. Cameron's testimony that it was necessary for him to help Mr. Legler sign his signature. It will be recalled that Dr. Welch, who had not seen his patient attempt to write, nevertheless expressed the belief that he would have experienced "great difficulty" had he attempted to do so. None of the rental checks issued by Mr. Mattson bear the deceased's endorsement. For instance, the one issued December 10, 1946, bears this notation upon its reverse side: "Geo. Legler. Pay to the order of First Nat'l Bank of Portland, for deposit only, V. K. Legler." It is conceded that Mr. Legler wrote none of the quoted words and names. The fact that he wrote nothing, when so slight an effort as his endorsement upon a check would have been materially helpful, is not without significance.

The evidence so far reviewed concerns the competency of Mr. Legler. It, however, is based in part upon incidents unconnected with the preparation of the will and the attacked deed. Before coming to a conclusion about his competency, we will consider the evidence

which shows what took place at the time of Mr. Cameron's two visits to Mr. Legler.

As we have mentioned, Mr. Cameron had in his possession, when he wrote the will and the contested deed, the lease which Mr. Legler, as lessor, and Mr. Mattson, as lessee, had signed. The execution occurred in 1944. The term of the lease was ten years and the rental was $50.00 per month. As a witness, the appellant said that she "was quite overcome" when, after the execution of the lease, she heard about the incident. She thought that the rental was too small. Presently a tenant appeared who was willing to pay $150.00 per month, provided the lease could be cancelled. Mr. Legler declined to display any interest in the overtures and thereupon the appellant consulted Mr. Cameron for the purpose, as nearly as we can glean from the record, of ascertaining whether the lease was valid and binding. At the same time she had Mr. Cameron perform a service, which no witness specified, concerning the sale of another item of property. How she became acquainted with Mr. Cameron is not disclosed by the record, unless it is indicated by the fact that Mr. Burton, the appellant's brother, had known Mr. Cameron for many years and had high regard for his ability. When the appellant called upon Mr. Cameron she brought with her the lease and left it with him. Mr. Cameron evidently told the appellant that the lease was valid. We have mentioned these circumstances for the purpose of taking note of the fact that the appellant had consulted Mr. Cameron in his capacity as an attorney before the latter came to her home and undertook to serve her husband. We also mentioned them for the purpose of showing that it was the appellant who delivered to Mr. Cameron the lease

which he used in the preparation of the attacked deed. It will be recalled that she also gave him the will of 1937, which became a base for drafting the will that was executed coincident with the deed. For the sake of completeness, we add that she also gave him the names of the decedent's grandchildren and occasionally interpreted to Mr. Cameron her husband's mumbled words.

The appellant denied that she requested Mr. Cameron to make either of his visits to her husband. Mr. Cameron and Mr. Burton both swore that it was the latter who requested Mr. Cameron to call upon Mr. Legler. According to Mr. Burton, Mr. Legler had asked him to have a responsible attorney come to his house and had explained that he had some legal work he wished to have done. Believing that Mr. Cameron was the kind of attorney who would please Mr. Legler, he gave the information to Mr. Cameron.

January 24 Mr. Cameron went to the Legler home. When he reached it he was admitted by the appellant who introduced him to her husband. We shall now review the evidence that pertains to that occasion. The appellant remained in the house during the visit. She described her home as small and said that she overheard much of what was said during Mr. Cameron's call.

Referring to Mr. Legler, Mr. Cameron testified:

"He told me that he wanted to change his will so that his wife, Mrs. Legler, would have the property on Sandy Boulevard. He was particularly concerned with that. It took me a considerable length of time to find out exactly what his wishes were."

We have quoted the parts of Mr. Cameron's testimony which show the manner in which he received from the

decedent his instructions. By reverting to the passage just quoted, it will be seen that Mr. Cameron was told that Mr. Legler wanted to change "his will." The passage says nothing about a deed or a request for one. The occasion which is now under review is the visit of January 24 when Mr. Cameron received his instructions. We have read the testimony with care, but have found no mention in it of a request, during the visit of January 24, for the drafting of a deed. That fact we deem important.

A will is revocable and passes no title in praesenti. Concurrently with the execution of a deed, title leaves the grantor. A deed is irrevocable. The subject matter of a will is bounty and, therefore, such an instrument is a complete stranger to the doctrine of consideration. A deed, upon the other hand, unless it evidences a gift, hovers closely to its affinity, the doctrine of consideration. The draftsman of a deed must know the consideration which the grantee is to give; otherwise he cannot prepare the required instrument. A will cannot create an estate by entirety between the person who executes it and that party's spouse. But a deed can effect such an estate between a grantor and the latter's mate. In the manner just indicated, a grantor, by availing himself of § 63-210, O. C. L. A., and by signing a deed calling for only half the fee, can create an estate whereby, at the time of his death, his grantee, if a spouse, will acquire the entire fee. Before the death, husband and wife, being in legal contemplation one, hold title as a whole and not by moieties. The deed, under § 63-210, calls for only "an undivided one-half", but it makes the wife as much owner as the husband. Together they hold *per tout et non per my.*

As we have said, the record discloses no mention of a request on January 24 for the drafting of a deed. No reference appears anywhere to the matter of consideration. No instruction was given, so far as we can ascertain, that papers be prepared to create an estate by entireties between husband and wife. If, during the course of the visit of January 24 an explanation was given to Mr. Legler that, upon signing the proffered deed, which undertook to convey "an undivided one-half interest" in the city lot, the appellant would become owner to the same extent as himself and, upon his demise, would acquire the entire fee, no one mentioned the fact. Likewise, if he was told that the deed, unlike the will he had just signed, was irrevocable, that fact was unmentioned by any witness. Further, if anything was said about the effect of a deed upon the monthly rental, that discussion failed to get into the record before us. In short, the evidence about the conference of January 24 fails to use the word "deed" or any equivalent of it.

The visit of January 24 consumed an hour, according to Mr. Cameron. He already possessed the lease and from that he obtained the legal description of the city lot. During the course of the visit to Mr. Legler the appellant handed to Mr. Cameron the will that the decedent executed September 21, 1937, and from it he could obtain the names of Mr. Legler's children. However, neither that will nor the lease contained the names of George's children. Their names were given to Mr. Cameron by the appellant. When he reached his office Mr. Cameron drafted the contested deed and the will.

Before the drafted deed and will could be presented to Mr. Legler, Mr. Cameron was called to San Fran-

cisco. Upon his return to his office he was met with a telephone call from the appellant who told him that she had dissuaded her husband from devising to her any interest in the ranch, and that he should make the needed change in his draft of the will. Evidently Mr. Cameron had discerned in some manner during his visit to Mr. Legler on January 24 that he wished to devise an interest in the ranch to the appellant, but no witness mentioned what fractional part was to be devised to her or to anyone else. The nearest any witness came to that subject is the following, taken from Mr. Cameron's testimony: " * * * he wanted his children to share in that, and also his widow." It will be observed that the statement mentions no specific fractional interest such as a fourth or a third. The statement is inaccurate, for the will which Mr. Legler signed gave his son George no interest whatever in the ranch but included George's children. As a witness, the appellant explained that she told her husband that the ranch should descend to his children and that she should have no interest in it. Manifestly, she expected, when she had that talk with her husband, to receive the city lot. At any rate, upon the receipt of the supplementary instruction, Mr. Cameron redrafted the will.

February 6, 1947, the second visit occurred. On that day Mr. Cameron returned to the Legler home. This time he was accompanied by his secretary, Mrs. Betz, and brought with him the deed and the will. We shall now review the evidence which describes that visit. Mr. Cameron and Mrs. Betz were admitted to the home by the appellant. The latter acknowledged that she was in and out of the room occupied by her husband during the time Mr. Cameron and Mrs. Betz were there.

In fact, she helped to prop up her husband in the bed when the time came for signing the papers. Likewise, it was she who searched, unsuccessfully, for Mr. Legler's glasses when he manifested a request for them.

Mr. Cameron swore that when he presented the will to Mr. Legler he read the instrument to him, "one paragraph at a time," and added:

"At the end of each paragraph I would ask, 'Is that exactly what you want?' and his answer was yes, that is what he wanted. He indicated to me definitely that that is what he wanted."

After that course had been pursued, the will was signed. Mr. Cameron and Mrs. Betz became the attesting witnesses. Then Mr. Cameron, according to his testimony, presented the deed. We now have the first mention made by a witness concerning a deed. We quote from Mr. Cameron's testimony:

"A. Yes. I said to him, 'Is it my understanding that you want your wife to have the property on Sandy Boulevard all for her own when you pass on; and he indicated to me very definitely and clearly, yes.

"Q. In what manner?

"A. By almost saying the words 'Yes, sir' as near as I could figure out, and by nodding his head.

"Q. What further did you say to him, if anything?

"A. I told him, I said by signing this deed it would not be necessary to probate that part of the estate and that it would be his wife's upon his death. I said, 'Do you thoroughly understand that?' and he indicated to me that he did.

"Q. That was before he signed it?

"A. That was before he signed it, indeed it was, sir.

"Q. Was there any further communication about the deed?

"A. I wouldn't say."

The above-quoted words, "I said by signing this deed" constitutes the first use by any witness of the word "deed". It may be that Mr. Cameron, who is an able attorney, said something to Mr. Legler during the first conference about a deed and that his failure, as a witness, to have mentioned the matter was due to inadequate interrogation; but this case concerned the deed, called for a complete disclosure, and a suit which is based upon charges of cozenry is a serious matter. We are forced to assume that nothing was said to the aged grantor about a deed until after he had executed the will.

Mrs. Betz testified:

"Then Mr. Cameron took the will out of his briefcase and started to read it to Mr. Legler, paragraph by paragraph, pausing after each paragraph and asked him if he understood what was written and if that was what he wanted, and in each instance he always nodded and said yes. And then after that he, as I recall—I am not too certain about this; he may have pulled the deed out then—but nevertheless he went through the same procedure with the deed, reading it to him and explaining it to him, and asked him if that is what he wanted, and he also nodded and said yes. So then Mr. Cameron called Mrs. Legler to assist in raising Mr. Legler so that he could sign these papers."

So far as we have been able to determine from the evidence, the above is the only explanation that was given to Mr. Legler concerning the deed which was proffered for his signature. The explanation was made, it will be observed, during the second visit and not until after the will had been executed. Evidently,

although he had not been requested to prepare a deed, Mr. Cameron felt that a deed would serve Mr. Legler's purposes better than a will, so far as the city lot was concerned. By reverting to his testimony, it will be seen that he told Mr. Legler that the effect of the the deed would be to render the property "his wife's upon his death." If that is all that Mr. Legler was told, he was not informed that the deed would immediately convey to the appellant a half interest. The half interest which she received at once—assuming the validity of the deed—created an estate by the entireties and enabled her to make her present claim; that is, to ownership of the entire property. In view of the above, the inference appears to be warranted that no one explained to the elderly grantor that a deed, unlike a will, transfers an immediate interest. It may be that the enfeebled grantor was not familiar with the nature of an estate by the entireties and may not have known that, although the will which he had executed only a moment previously was revocable, the deed was irrevocable and at once deprived him of an undivided part in the lot. He may also have been unaware that a deed which called for a half interest would render it inevitable that his wife would acquire the entire fee upon his demise. We refrain from a discussion of possible exceptions, since none could be applicable to this elderly bedridden grantor.

The residuary clause of the will which Mr. Legler had signed only a moment before the deed was presented to him devised to the appellant only a fourth interest in the city lot. Evidently he understood that provision and found that it conformed to his wishes, because when the provision was read to him he manifested his assent. Both Mr. Cameron and Mrs. Betz

so testified. Of course, the fourth interest was given by the residuary clause, but it was the only property to which that clause was applicable. Obviously, this debilitated man whom death had marked unmistakably as its victim did not expect to acquire other items of property for disposition under the residuary clause. The city lot, and it alone, was the subject matter of that clause of his simple will. After he had signed the will which devised to his wife only a fourth interest in the city lot, then the deed was presented for his signature. It created a tenancy by the entirety and contemplated that at his death the appellant should have the entire fee. If an explanation was made concerning the conflict of which we have just taken notice, no witness mentioned the fact.

The contested deed says:

"In consideration of Ten ($10.00) Dollars and other good and valuable considerations to me paid by Vernie K. Legler, * * * ."

No witness mentioned the subject of consideration and, hence, there is no evidence whatever indicating that the grantor was given anything for the deed. The appellant testified:

"Mr. Legler worried considerably about my health, because I had heart trouble for many years; and he knew I would never be able to work any more, and he wanted to know that I had a home and would be provided for."

That statement stops short of saying that love and affection were the consideration for the deed. In fact, the appellant, in testifying, never—not even once— used the word "deed". She wholly omitted the term from her testimony. It seems to us that if Mr. Legler

was able to talk, and if his alleged worries concerning his wife's future welfare finally culminated in his execution of the challenged deed, he would have handed it to her after he had signed it. In fact, we believe that he would have accompanied the delivery of the deed with the expression of a few words of appreciation for his wife's devotion to his care. But no witness uttered a word upon that subject. The appellant, far from mentioning the subject of the deed, said nothing about it and seemingly depended upon Mr. Cameron's testimony. It cast about the deed a commercial atmosphere rather than one that spoke of love, appreciation or gratitude. It will be recalled that the deed says: ''In consideration of Ten ($10.00) Dollars and other good and valuable considerations to me paid''. When we turn to the evidence showing what was done with the deed after it was signed, our impressions are confirmed that love and affection were not the consideration of the deed. Mr. Cameron testified:

''Q. And what was done with the deed after he signed it?

''A. After he signed it, I kept it in my possession.''

We repeat, if gratitude for the care his wife was giving to him constituted the springboard for the deed, one would think that the grantor would have handed the deed to his wife—provided, of course, that his mind functioned. The fact that nothing of the kind occurred is deserving of attention.

There remain for mention only two more facts. The deed was promptly recorded. Neither Mr. Legler's children nor Mr. Mattson, the tenant, received any intimation of the deed until after the death. The appellant argues that she was under no duty to have given

the respondents information concerning the deed. That very likely is true, and yet we cannot understand why Mr. Mattson was not told about it. It appears to us that he was entitled to know his landlords. When transactions are hidden from the light of day, suspicion is aroused. Even though the appellant was under no duty to divulge the transaction to the respondents, the father's silence is significant. He had told people of his plan that the children should have an interest in the city lot upon his death. When he made the declarations he mentioned Fred especially. The wills of 1937 and 1939 were in harmony with his declarations. It seems strange that this elderly man, as he lay upon his deathbed, expecting soon to be called upon by his Maker to give an account of his life, said nothing to Fred about the deed—if he had the power to speak and if his mind still functioned. Likewise, if he had, in fact, wittingly changed his often-declared plan, and if his mental faculties were not unduly impaired, he would have wanted Fred to know what he had done, so that his death would not be followed in its wake by litigation over the deed. We believe that the silence is significant.

The appellant presents the two following basic contentions:

"The evidence shows that the decedent was competent to execute the deed."
"The evidence shows that the decedent was not subject to any undue influence in making the deed."

This court has held that more mental capacity is required to engage in a transaction involving the execution and delivery of a deed than to write a will: *Gilliam v. Schoen,* 176 Or. 356, 157 P. 2d 682, and *Miller v. Jeffrey,* 129 Or. 674, 278 P. 946. Generally, a grantor,

unlike a testator, must cope with another party to the transaction, that is, with a grantee. He must be able to look out for himself concerning such matters as consideration, warranty and terms of sale. When a deed, like the present one, is testamentary in character, it might seem that no more mental capacity should be required of the grantor than if he executed a will. But deeds, even though testamentary in nature, unlike wills, are not revocable. They afford no opportunity for giving effect to afterthoughts. Moreover, this deed recites a "purpose of creating an estate in entirety between myself the grantor herein and my wife." Since allonges of that kind can be included in testamentary deeds, we think that there is wisdom in the rule which requires a grantor to possess greater competency than a testator.

In *Dodds v. Mayer*, 135 Or. 43, 294 P. 1040, we held that a grantor must have at least sufficient intelligence to enable him to understand the transaction in which he is engaged, and *Miller v. Jeffrey*, supra, pointed out that a grantor must be able to reason, to exercise judgment, to transact ordinary business and to compete with the other party to the transaction. In 26 C. J. S., Deeds, § 54, at page 261, it is said:

> "The test of mental capacity to execute a deed lies in the capacity to understand the nature of the act and to apprehend its consequences. One possessing such capacity may execute a valid deed although mentally weak or infirm, at least in the absence of attendant circumstances of an inequitable character, although one lacking such capacity may not execute a valid deed even though he is not bereft of understanding. Capacity should be measured as of the date of the execution and delivery of the instrument."

Thus, we see that the deed before us cannot be valid unless Mr. Legler, on February 6, 1947, possessed sufficient mental powers so that he could not only exercise judgment and reason, but be able to apprehend the consequences of signing the paper that was submitted to him.

■ If there are doubts upon the subject, the question occurs: Upon whom rested the burden of dispelling the doubts. Wigmore on Evidence, 3d Ed., § 2503 says:

> "Where the grantee or other beneficiary of a deed or will is a person who has maintained intimate relations with the grantor or testator, or has drafted or advised the terms of the instrument, a presumption of undue influence or of fraud on the part of the beneficiary has often been applied. But it is impossible to say that any single circumstance or group of facts is the invariable mark of such a presumption, or that there is any uniform rule capable of application apart from the facts of each case."

■ From Restatement of the Law, Restitution, § 166, we quote:

> "Where the owner of property transfers it, being induced by fraud, duress or undue influence of the transferee, the transferee holds the property upon a constructive trust for the transferor."

Comment (d) which follows that rule points out:

> "A constructive trust arises where one person acquires the title of property from another by undue influence (see Restatement of Contracts, § 497). It arises where one person acquires title to property from another by an abuse of a fiduciary or confidential relation between them (see Restatement of Contracts, § 498). * * *
> "Although the relation between two persons is not a fiduciary relation, it may, nevertheless, be a

confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation is particularly likely to arise where there is a family relationship   *   *   *   . If one person is in a confidential but not a fiduciary relation to another, a transaction between them will not be set aside at the instance of one of them unless in fact he placed confidence in the other and the other abused the confidence placed in him   *   *   *   ."

■ This court has many times employed the rule which we quoted from Wigmore and the Restatement. The most recent instance is *Evans v. Anderson,* 186 Or. 443, 207 P. 2d 165, wherein the rule is expressed as follows:

"Ordinarily, the burden of proving undue influence rests upon the party alleging it. However, where a fiduciary relationship exists between donor and donee, there is a presumption of undue influence and the donee is required to produce evidence sufficient to establish that the gift was the free and voluntary act of the donor and that the transaction was fair and equitable. Gilliam v. Schoen, 176 Or. 356, 363, 157 P. 2d 682, and authorities therein cited."

■ As long ago as 1879 this court said:

"The law seems to be well settled that when one accepts a confidential or fiduciary relation to another, as that of guardian and ward, attorney and client, and the like, where the donee or grantee is supposed to exercise an unusual and commanding influence over the grantor, courts will set aside the conveyance, unless the grantee can show the transaction was fair, and without fraud or undue influence." Gilmore v. Burch, 7 Or. 374, 33 Am. Rep. 710.

*Jenkins v. Jenkins,* 66 Or. 12, 132 P. 542, has been frequently cited. It reasoned:

"A gift obtained by any person standing in a confidential relation to the donor is prima facie void, and the burden is thrown upon the donee to establish to the satisfaction of the court that it was the free, voluntary, unbiased act of the donor. A court of equity, on grounds of public policy, watches such transaction with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor as amounts to legal incapacity to make a will or execute a valid deed or contract."

*Egr v. Egr,* 170 Or. 1, 131 P. 198, in setting aside a trust instrument and two deeds signed by aged parents in favor of one of their sons, depended much upon provisions of the Restatement which we have cited.

The appellant does not challenge the rule of which we have taken notice, and, hence, we shall resort to the authorities no further. *Egr v. Egr,* supra, and *In re Knutson's Will,* 149 Or. 467, 41 P. 2d 793, mentioned the fact that it is never safe to infer fraud from the mere fact that the donee possessed the confidence of the donor. The chances are that every kind, considerate, dutiful wife possesses the confidence of her husband. Gifts are made, not to enemies, but to those who have won the donor's esteem, affection good will or confidence. As was said in *Bliss v. Bahr,* 161 Or. 79, 87 P. 2d 219:

"It is not the existence of the confidential relationship alone that constitutes undue influence, but it is the wrongful use thereof which invalidates the conveyance."

The problem now confronts us: Does the evidence which the appellant submitted show that the

execution of the deed was free from suspicion and that it represented the voluntary act of a competent grantor. The trial judge, in a comprehensive memorandum opinion, stated:

"Mrs. Legler's actions during the whole of this transaction and also leading up to it are not free from criticism, in the Court's opinion. According to the testimony, she showed more than a passing interest in whether the lease of the property could be broken owing to the small amount of the rent received thereunder. Mr. Cameron testified that when he and his secretary went out to Mr. Legler's residence 'Mrs. Legler was some place in the room— I don't remember,' and in the next sentence it is recited that when a chair was required to prop him up in bed to sign the deed she was the one who brought it when he 'attempted to make his signature,' and it was she who made the unsuccessful search for the glasses without which he was unable to see anything. If each paragraph of the will was read to the testator prior to its execution, there is nothing in the evidence showing that any explanation was made to him as to what effect the deed still to be signed would have on Paragraph Fourth of the will other than the remark as already quoted, 'by signing this deed it would not be necessary to probate that part of the estate and that it would be his wife's upon his death. I said "Do you thoroughly understand that?" and he indicated to me that he did.' (Trans., p. 86). It appears, however, to the Court that with the ink scarcely dry upon the will, in which on the same day, at the same place, and at the same time he had already devised it to his wife, Fred, Margaret and his four grandchildren, he did not understand the nature of the transaction. Also suggestive is the fact that the deed in question was unknown to all the others who would have had an interest in the property.
      *   *   *

"The Court has nothing further to add in this connection other than to find that Mr. Legler was not competent to execute the deed in question on the sixth day of February, 1947, and that further, in view of the undue influence brought to bear upon him, his total inability to understand the nature of the transaction, and the secrecy employed in connection with the execution of the deed, the cancellation thereof as prayed for will be decreed."

We concur in those views and adopt them as our own. We have familiarized ourselves with this case as completely as is possible from a dry record. Obviously, appellate court judges must depend much upon the analysis of a case given to it by the trial judge.

We have no disposition to brand as false the testimony of those who felt that through patient effort, loving care or Mr. Cameron's trial-and-error method, the decedent's mutterings could be interpreted. Yet the evidence falls short of satisfying us that the aged bedridden victim of a second stroke could reason, exercise judgment or transact simple items of business. In reaching that conclusion, we have depended, not so much upon the opinions of witnesses, as upon Mr. Legler's daily routine of living, such as (a) the fact that the appellant did not even ask him to endorse the monthly rental checks; (b) the fact that Mr. Legler had not had his glasses for five and one-half months before he signed the challenged deed, and, accordingly, had neither read anything nor transacted any business in that period; (c) the fact that after signing the deed he did not mention it to his children; and (d) the fact that she made his telephone calls for him, as, for instance, the one to Mr. Cameron. There are other circumstances of like kind, but the ones just mentioned will suffice to indicate what we have in mind. They

show that the appellant treated her husband as incompetent.

We believe that a confidential relationship existed between the appellant and her patient, who was so helpless that he could not speak to his physician and could not even put food into his mouth. She was, in truth, his custodian. His very existence depended upon her. To the extent that one in his simple circumstances had business transactions, such as the collection of rents, the deposit of money in the bank, the discharge of taxes and the payment of current expenses, the appellant attended to them. The confidential relationship had some of the elements of a fiduciary one.

We think that the appellant participated in the transaction out of which the deed came forth. The memorandum opinion of the trial judge recites some of the circumstances we have in mind. It will be recalled that she interpreted for Mr. Cameron some of her husband's mumbled words and that she handed to the attorney documents which he employed when he drafted the contested deed. She also telephoned to him a message which caused him to make a material change in his drafted will. The change affected the deed. Her contacts with the transaction were numerous. In reciting them, we do not censure this phase of the appellant's action. Very likely there are many wives who, in attending to a bedridden mate, are unfamiliar with the distinctions made by the law and deliver messages to an attorney, and otherwise participate in the drafting of a legal paper. But, since the appellant was an active participant, was present at both of the conferences and heard virtually everything that was said, she could properly be called upon to give an account.

The deed came forth, in our opinion, from a transaction in which the appellant participated under cir-

cumstances which demanded an explanation. For instance, there was the element of secrecy. So far as we know, there was no ill feeling between the appellant and the respondents, nor was there any ill will of which we are aware between the appellant and Mr. Mattson, the tenant. The secrecy provokes suspicion. The execution of the deed constituted almost a complete about-face from previous plans which Mr. Legler had long entertained and which he had mentioned to people even outside of the family circle. In fact, it involved the disposition of his most valuable asset, not by a will as he had contemplated for many years, but by a deed.

The above being the circumstances, we think that this is an instance in which the appellant was confronted at the close of the respondents' case with a presumption that she had misused the power she possessed over her debilitated mate. The presumption demanded of her an explanation. It was not an artificial creature of the law, for any layman, unversed in the law but familiar with the facts above stated, would naturally turn to her and expect an explanation. In short, he would infer that she must have induced her stricken, helpless mate to sign this deed.

We do not find it possible to accept the explanation that has been given. We are not satisfied that Mr. Legler knew that the papers he was called upon to sign conveyed away a half interest in the city lot and irretrievably committed him to a scheme whereby, upon his death, the half would be followed by the whole. A layman who subscribes to the adage that a half loaf is better than none could not be expected to know that a half title is the equivalent of the whole, in the absence of clear explanation.

We express our belief that the appellant did not discharge the burden of proof that rested upon her.

■ Finally, the appellant cites as error an order of the Circuit Court which overruled her objections to two items of $50 each in the bill of disbursements, being witness fees for Dr. Welch and Dr. Burkes. The respondents argue that an expert witness is entitled to more remuneration than one who testified to non-expert facts only. The problem before us is not one of remuneration but of their recovery in a cost bill.

Section 10-906, O. C. L. A., says:

"A party entitled to costs shall also be allowed for all necessary disbursements, including the fees of officers and witnesses, * * *."

Section 87-962 says:

"The following fees shall be allowed to witnesses in the county of Multnomah: For each day's attendance on a court of record, $2; * * * ."

*Henkel v. Chicago, St. P., M. & O. Ry. Co.,* 284 U. S. 444, 76 L. Ed. 386, 52 S. Ct. 223, held:

" * * * But when the Congress has prescribed the amount to be allowed as costs, its enactment controls. * * * The Congress has dealt with the subject comprehensively and has made no exception of the fees of expert witnesses. Its legislation must be deemed controlling * * * ."

The decision held that the Federal District Court for the District of Minnesota could not allow as a disbursement extra compensation paid an expert witness under a Minnesota statute. In 20 C. J. S., Costs, § 244, page 477, it is said:

"Except as authorized by statute compensation for expert witnesses, beyond the ordinary fees au-

thorized for witnesses generally, cannot be taxed as costs.''

Accordingly, the two challenged items must be stricken.

The above disposes of all contentions. The decree of the Circuit Court, after elimination from it of the award of the erroneous amounts totaling $100 as compensation for the expert witnesses, will be affirmed.