Argued August 27, affirmed October 22, 1979

# URIBE,
## *Respondent,*
### *v.*
# OLSON,
## *Appellant.*

## (No. 77-78E, CA 12772)

601 P2d 818

Alan R. Scott, Jr., Eugene, argued the cause and filed the brief for appellant.

Gerald R. Pullen, Portland, argued the cause and filed the brief for respondent.

Before Tanzer, Presiding Judge, and Thornton and Campbell, Judges.

THORNTON, J.

## THORNTON, J.

This is an appeal from a decree directing specific performance of two contracts to sell land.[1] Defendant assigns as error the trial court's finding that one of the vendors, Mrs. Bonham, had the capacity to contract for the sale of her parcel. Defendant also assigns error to the decree of specific performance contending that the ten percent liquidated damages clause in the contracts was intended by the parties to be the exclusive remedy for breach.

The facts are as follows:

Ruby Bonham, aged 81 at the date of the contract, owned 80 acres of land near Grants Pass. Her daughter, defendant Pauline Olson (who appeals both in her personal capacity and as conservator of the estate of her mother) owned an adjacent 10 acre parcel. In early 1976, Mrs. Bonham decided to sell her property and, desiring a national listing, contacted Mr. Martin of United Farm Agency. She originally wanted to ask $80,000 for the property but was persuaded by Mr. Martin, based on his experience and the fact that he had listed a similar parcel for $55,000, to reduce the asking price to $60,000. Mr. Martin further advised her that she should consider any offer above $50,000.

In July, 1976, plaintiff became interested in the property. He visited it on July 31, 1976. Based on this inspection he offered $50,000 for the parcel, contingent on Mrs. Olson's agreeing to sell her adjacent property for which he offered $15,000. The following day, Mr. Martin discussed the offer with both women and they rejected the offer as too low. Following a discussion with Mrs. Olson's attorney, they made a counter offer to plaintiff of $52,500 and $20,000 for the two parcels respectively. This offer was accepted and Mr. Martin procured the signatures of each of them. He testified that before she signed the earnest

---

[1] The specific performance decree included an abatement of the purchase price for timber which was removed from the land by a third party at defendant's request following repudiation of the contracts.

money agreement on September 28, 1976, he had explained the details of the transaction to Mrs. Bonham in the presence of her sister. In December, 1976, Mrs. Olson decided that her mother was not competent at the time she signed the counter-offer and both refused to sign the final contracts.

Medical evidence of two doctors who treated Mrs. Bonham beginning in November, 1976, showed that she suffered from a heart blockage which caused seizures and blackouts and involutional psychosis resulting in depression. Both agreed that the condition would have been present prior to September, 1976, and could well have affected her mental processes.

Friends and relatives of Mrs. Bonham all testified to a gradual deterioration of her mental acuity over several years prior to the transaction in question. This deterioration manifested itself in a number of ways, including periods of disorientation and depression, occasional paranoia, an increase in eccentric habits and delusions concerning people long dead and imagined friendships with Barry Goldwater and Frank Sinatra.

On the other hand, plaintiff testified that while Mrs. Bonham appeared eccentric to him, he had no reason to question her capacity. When he visited the property, she showed him around and answered all his questions respecting the features of the property. Mr. Martin testified that she accurately answered all his questions when he prepared the listing agreement and appeared at all times to know that she was engaged in selling her property, apparently intending to move back to Tennessee, where she had grown up.

On September 28, 1976, when Mrs. Bonham signed the earnest money agreement, Mr. Martin testified he explained the details to her carefully, that she read the agreement and appeared to understand. Mrs. Bonham's sister, who was also present, testified that Mrs. Bonham just stared into space while Mr. Martin read the agreement to her and her only comment was,

"I don't care what you do with this property. You can give it back to the Indians if you want to."

Mrs. Olson testified that she finally accepted that her mother was incompetent in October, 1976, and first discussed with her attorney the possibility of creating a conservatorship at that time. Based on this decision, she refused to sign the final contracts.

The test of contractual capacity is whether a person is able to understand the nature of his action and apprehend its consequences. *Coke v. Coke*, 242 Or 486, 489, 410 P2d 214 (1966). This capacity is measured at the time of the execution of the contract, in this case, the earnest money agreement. *First Christian Church v. McReynolds*, 194 Or 68, 72, 241 P2d 135 (1952). Even where there are substantial indications of mental incompetence, it is possible that a person may have "lucid intervals" during which he possesses the requisite capacity. *Pioneer Trust Co. v. Currin*, 210 Or 343, 347, 311 P2d 445 (1957). Capacity includes the ability to reason and exercise judgment and, in essence, to bargain with the other party. *First Christian Church v. McReynolds, supra*, 194 Or at 72-73. Neither old age, illness nor extreme emotional distress is sufficient of itself to negate such capacity. *Id.*

In *Gindhart v. Skourtes*, 271 Or 115, 530 P2d 827 (1975), the seller suffered from an arteriosclerotic condition which caused periods of confusion which he claimed reduced his mental competence. He suffered a stroke shortly after the sale. The evidence showed, however, that he had tried to sell the land for two years without success, rejected the buyers' first offer and subsequently reached a compromise price which defendant's experts testified was in line with other prices for land in the area. 271 Or at 119. The court found him competent.

In *Pioneer Trust Co. v. Currin, supra,* plaintiff's ward appeared disoriented and unresponsive and frequently talked to himself. He was committed to a mental hospital four months after selling the land in

question. Nevertheless, he had lucid periods and defendant testified he had shown him around the place and answered all his questions in a normal fashion. The ward told defendant he was anxious to sell because he intended to leave the state soon and wanted cash. Defendant purchased the property for cash at a price below what probably could have been obtained. The court held the ward competent to enter into the contract.

■ While there is ample evidence to establish that Mrs. Bonham's mental state on September 28, 1976, had deteriorated substantially from what it once had been, this does not resolve the matter. We are persuaded, largely by the circumstances of the sale, that Mrs. Bonham was competent to sell her land. Mrs. Bonham had definite ideas about how the property should be listed and accurately supplied all the necessary information. The purchase price was negotiated over several months and the offer that was ultimately accepted was made by Mrs. Bonham and Mrs. Olson. Before obtaining her signature, Mr. Martin read the important features of the earnest money agreement to Mrs. Bonham and had her read the document, a point of considerable significance. *First Christian Church v. McReynolds, supra,* 194 Or at 83. Furthermore, Mrs. Olson and her attorney were constantly involved and no one, prior to November, 1976, suggested that Mrs. Bonham did not possess the requisite competence. In fact, defendant's primary dissatisfaction with the deal appears to be the price obtained, not the fact that the property was sold. In sum, the evidence indicates that Mrs. Bonham knew what she was doing and, though her reasons for selling may not have been altogether wise, she intended to sell and was cognizant of the consequences.

## PROPRIETY OF THE REMEDY

Defendant contends that the liquidated damages clause in the earnest money agreements evinces the intent of the parties that it be the exclusive remedy in

the event one party decided not to proceed with the sale.

The clause in question reads:

> "It is agreed, if either seller or buyer fails to perform his part of this agreement, he shall forthwith pay to the other party hereto a sum equal to 10% of the agreed price of sale as consideration for the execution of this agreement by such other party."

■ The presence in a contract to sell real estate of a liquidated damages or forfeiture provision will not per se preclude specific performance. *Slattery v. Gross*, 96 Or 554, 558, 187 P 300, 190 P 577 (1920); 5A Corbin, Contracts 435-36, § 1213. It must appear from the construction of the contract that the damages provision was intended by the parties to be the exclusive remedy for breach. *Potter Realty Co. v. Derby*, 75 Or 563, 571, 147 P 548 (1915). In *Potter*, the contract provided that in the event of breach by the buyer, installments made under the contract would be forfeited, and the "contract shall be null and void as to both parties hereto * * *." 75 Or at 566. The court held this remedy to be exclusive.

■ Defendant cites *Dillard Homes, Inc. v. Carroll*, 152 So 2d 738 (Fla App 1963). That case does not support defendant's position since the clause provided that the deposit of ten percent of the purchase price would be forfeited and "the parties hereto shall be relieved of all obligations under this instrument." 152 So 2d at 739. The authorities cited in that case support the proposition that the intent to preclude specific performance as a remedy must clearly appear. *Deborah Homes v. Firestone*, 135 NYS2d 289 (Sup Ct 1954) (upon buyer's failure to take title, contract would be "deemed cancelled"); *In re Tatnall*, 102 NJ Eq. 445, 141 A 174 (1928) (sum to be retained "as liquidated damages, without any further liability of any kind whatsoever * * *.") 152 So 2d at 740-41. *See also Rootberg v. Richard J. Brown Assoc.*, 14 Ill App 3d 301, 302 NE2d 467, 469-70 (1973), where the contract contained a clause reserving specific performance as a

[653]

seller's remedy which had been lined out prior to execution of the contract and the court remanded rather than hold as a matter of law that it constituted an intent to bar specific performance.

The intent to eliminate specific performance as a remedy does not appear from the clause in the contracts at issue.

Affirmed.