Argued and submitted February 8, reversed and remanded with instructions
December 26, 1985

# RYAN et al,
*Appellant,*

*v.*

# COLOMBO et al,
*Defendants,*
# KELLER
*Respondent.*

(A8202-00599; CA A32576)

712 P2d 139

Kenneth H. Evans, Jr., Portland, argued the cause and filed the briefs for appellant.

Joyce Ann Harpole, Portland, argued the cause for respondent. With her on the brief were Barnes H. Ellis and Stoel, Rives, Boley, Fraser & Wyse, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

This action seeks to set aside a deed whereby Thomas Martin and his wife, Svea Martin, conveyed their joint interest in the family residence to the trustee[1] of Svea's *inter vivos* trust. Prior to the conveyance, they had held the property as tenants by the entirety. ORS 108.090. Plaintiff contends that the deed should be set aside, because: (1) Thomas lacked the mental capacity to execute it; (2) it was the product of undue influence by Svea, and (3) it fails to satisfy the Statute of Frauds. ORS 93.020. Trial was to the court, which entered a judgment for defendants. We review *de novo* and reverse.

During the early part of 1971, Thomas, who was then about 73 years of age, and Svea, who was apparently about the same age, decided to get married. Thomas had been married before and had a son; Svea had been married twice before, but had no children. At the time, each of them owned a home in the same neighborhood of comparable construction, size and age. We refer to Svea's house as the Bryant Street house. On May 26 of that year, they executed a prenuptial agreement, the purpose of which was to ensure Svea complete ownership and control over her "considerable property, both real and personal * * * as though no marriage relation ever existed." It did not affect Thomas' property. On the same day, Thomas gave Svea a check for $15,000, bearing this notation: "For the N. Bryant house." There was testimony that the $15,000 represented the proceeds that Thomas had received from the sale of his home.

Thomas and Svea were married on June 4, 1971. Ten days later, she executed a deed conveying the Bryant Street property to a third party, who immediately reconveyed the property to Thomas and Svea, thereby creating an estate by the entireties in what had been her home. On June 17, 1971, Svea executed a will leaving Thomas $5,000 together with the household goods, furnishings and fixtures in the Bryant Street house, the rest of her estate going to her relatives in Sweden.

By December, 1980, Svea was fighting a losing battle

---

[1] Colombo, the personal representative of the estate of Svea Victoria Martin, was dismissed as a party by stipulation of the parties; all of the other defendants, except the trustee, defaulted. The trustee is the only defendant to appear at trial and in this court.

with cancer and became concerned anew with planning her estate. She consulted Mr. Walker, who had been her financial advisor for several years; he recommended that she establish an *inter vivos* trust and instructed an attorney to prepare the trust agreement. The attorney was told, pursuant to instructions that Walker received from Svea, that the Bryant Street property was to be part of the trust *res*. Both Thomas and Svea met the attorney for the first time on December 30, 1980, at which time Svea executed the trust. In relevant part, the trust provides that on Svea's death, if Thomas survived her,

> "he is to have the right to live in the family residence if he so chooses. In the event said Thomas M. Martin shall cease to live in said residence as his principal place of occupancy or if said Thomas Martin so requests then the trustee shall sell the residence and in this event 1/2 of the net sales proceeds shall be distributed to Thomas Martin if living with the remaining 1/2 to be distributed to my [relatives]."

The other trust assets were also to be distributed to her relatives. The trust could be amended or revoked at any time without notice to anyone but the trustee.

On January 22, 1981, Svea and Thomas again met with the attorney, and Svea executed a new will, which was substantially the same as her 1971 will, except that it omitted the $5,000 bequest to Thomas, leaving him only their household goods, furnishings and fixtures, with the rest of the estate going to her relatives. It was at this meeting that Thomas and Svea executed the deed conveying the Bryant Street property to her trustee. Svea died on May 7 of that year.

The attorney who prepared the trust document and Svea's second will testified that he read the trust document in Thomas' presence and that he told Thomas and Svea that "a deed would need to be executed in order to implement the trust." In his opinion, Svea was the "moving party" and assumed the "managerial role" between the two. The attorney did not advise Thomas concerning the legal effect the conveyance would have on his interest; however, he testified that he was satisfied that Thomas was "aware of what Svea was doing * * *."

The financial adviser, Walker, testified that the terms of the trust were "discussed" with both Thomas and

Svea on "at least three different occasions." He was at the attorney's office when Svea executed the trust and testified:

"Q: All right. Now, do you recall yourself talking to Tom Martin at the time of signing this inter vivos trust regarding the document?

"A: I asked him specifically on that occasion as well as a number of others, mostly because I wanted to assure myself that he had a clear understanding as to what was going to be accomplished when the conveyance of the real property was made to the trustee. I explained to him again that in order to have the property conveyed to the Trustee it would be necessary that he forfeit or give up his right to the real property. And I asked him again if he understood what he was doing, and he indicated, not that he understood perhaps, but if that was what Svea wanted, that's what he wanted.

"Q: Did you draw a schematic picture to show him?

"A: Yes I did.

"Q: Can you give us your best recall of that?

"A: I attempted to draw a picture as one would draw a picture to suggest a house, to suggest the framework of a house. And I then drew a wiggly line through the house and then I drew two parts of hopefully the same structure, and that the trust instrument was executed and prior to the conveyance execution that each of them at that point in time owned an undivided interest in that real property, and that it could not be defeated by either of them individually and that he had to acquiesce by execution of a document to that effect.

"I said, I asked again, Tom, do you understand what I'm attempting to, something to that effect, what I'm attempting to explain, and he said, if that's what Svea wants, that's what I want."

On cross-examination, Walker, who is not an attorney, testified further as follows:

"Q: Last questions. Mr. Walker, do you consider yourself qualified or competent to explain the legal ramifications of a transfer of tenancy by the entirety property?

"A: I believe I am.

"Q: Did you make such an explanation to Tom Martin?

"A: Yes, I did.

"Q: Did Mr. Martin express to you his understanding of that other than saying yes?

"A:   I don't recall that he said anything more than if that was Svea's wants, that's what I want."

■■■   We turn to plaintiff's first contention that Thomas was not competent to execute the deed. A grantor is required to possess greater competency to execute a deed than is required of one executing a will, because a deed is irrevocable and a will is not, and also because a grantor, unlike a testator, must deal with another party to the transaction. *First Christian Church v. McReynolds,* 194 Or 68, 241 P2d 135 (1952); *Legler et al. v. Legler,* 187 Or 273, 211 P2d 233 (1949). However, we do not believe that plaintiff has sustained his burden of proving that Thomas was incompetent at the time that the deed was executed. The test is whether, at that time, Thomas had the "ability to understand the nature and effect of the act in which he is engaged and the business which he is transacting." *First Christian Church v. McReynolds, supra.*

The record shows that 11 months after he executed the deed, Thomas, then 84, was examined to determine whether he should have a guardian *ad litem* to appear on his behalf in this litigation. He was diagnosed as suffering from Alzheimer's Disease, and the doctor recommended the appointment of a guardian. Further, the trial court determined that he was not competent to testify at trial. Although that disease is progressive, Thomas' earlier medical examinations reflected only some physical problems and hypertension. There is evidence that Thomas had had memory problems off and on for several years. However, in June, 1981, Thomas executed a will, and the attorney who prepared it and attended its execution testified that, in his opinion, Thomas was competent at that time.

Although Thomas could have been competent to execute his will and yet incompetent to execute the deed, there is insufficient evidence relating to Thomas' lack of competence in January, 1981, when the deed was executed, to permit the conclusion that he was incompetent at that time. The record does, however, permit the inference that Thomas had had memory problems for several years and that he had probably been suffering from the early stages of Alzheimer's Disease for an unknown period of time. Those facts are relevant to our next inquiry.

■  Whether the deed was the product of undue influence is a closer question. That subject has been discussed frequently by the courts, particularly in connection with wills, and not always with the same thrust. Some cases have emphasized that, when undue influence is exercised over another to execute a will, the will, in reality, is not his will but is the will of another person. *See In Re Estate of Porter,* 192 Or 483, 492, 235 P2d 894 (1951). Other cases have emphasized the unfairness of the advantage which is reaped as the result of wrongful conduct and pose the question as being whether the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper. *See In Re Reddaway's Estate,* 214 Or 410, 329 P2d 886 (1958). Whatever the test, it is the same for both wills and deeds, *Albright v. Medoff,* 54 Or App 143, 634 P2d 479 (1981), although some factors, such as the absence of independent advice and counsel, may weigh more heavily in the case of a deed than in the case of a will. *See Gilliam v. Schoen,* 176 Or 356, 157 P2d 682 (1945).

■  Generally, when a confidential relationship exists between the grantor and the one receiving an advantage, with a resulting superiority and influence over the grantor, *In Re Estate of Manillus Day,* 198 Or 518, 530, 257 P2d 609 (1953), it is said that only slight evidence is sufficient to establish undue influence. *In Re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858 (1952). If, in addition to the confidential relationship and position of dominance, there are suspicious circumstances, the one receiving the advantage has the burden of going forward with evidence sufficient to overcome the adverse inference resulting from the existence of those factors. *In Re Southman's Estate,* 178 Or 462, 168 P2d 572 (1946).

Here, it is undisputed that a confidential relationship existed between Thomas and Svea; from the evidence, it is reasonably clear that Svea was in a position of dominance over Thomas. She was the dominant partner and played the managerial role; he wanted what she wanted. Whether there exist here what have been termed "suspicious circumstances" involves further analysis of the facts in the light of the factors identified by the court in *In Re Reddaway's Estate, supra.*

It is clear that Svea wanted to retain and control all of her property to the exclusion of Thomas. That was the

purpose of the prenuptial agreement that Svea had had prepared and that Thomas had signed immediately before their marriage. That agreement, by its terms, governed the Bryant Street property as well as Svea's personal property. The agreement, however, did not reserve to Thomas all of his property, which at that time apparently consisted only of his home. A reasonable inference from the evidence is that he and Svea had agreed that he would sell his home and purchase an undivided one-half interest in her home with the proceeds. He did sell his home and delivered the proceeds to Svea, and she caused her property to be conveyed to them as tenants by the entireties.

Nine years later, when Svea realized that she had only a short time to live, she apparently was not satisfied with being able to leave to her relatives her individual assets of approximately $220,000. Her will, executed immediately following her marriage to Thomas, left $5,000 and the household goods and furnishings in the Bryant Street house to him and the balance of her estate to her relatives in Sweden. It appeared reasonably certain by late 1980 that she would die before Thomas; he would become the sole owner of the Bryant Street property, in which case her relatives would not inherit that property. She consulted Walker, her investment adviser, concerning her estate plan. Apparently, Thomas was present during at least three meetings with Walker.

According to Walker, his notes indicated that the residence was jointly owned, that Svea stated that she wanted Thomas to be able to live in the home as long as he wished but that, if he decided to sell the home, one-half of the net sale proceeds would pass to him and the other half to persons named in the proposed trust agreement. Walker then had an attorney prepare the trust agreement, a new will for Svea and the deed necessary to transfer the residence to the trustee.

After those documents were prepared, Thomas, Svea, Walker and the trustee met in the attorney's office. The trust agreement was read out loud and it was stated that it would be necessary for Thomas and Svea to execute a deed conveying the residence to the trustee. However, the record does not indicate whether anyone explained to Thomas all of the implications of transferring the Bryant Street property to the trustee. Walker, as indicated above, said that he attempted to

explain what a tenancy by the entireties was, but there is nothing in the record to indicate that Thomas was told that there were disadvantages to his giving up his interest. It does not appear that anyone asked Thomas if he understood the overall transaction. It is clear that the attorney and Walker represented Svea and that no one suggested to Thomas that he have independent advice and counsel before executing the deed.

Although there was no secrecy in what was done, it is clear that it was Svea who procured the deed in order to have the residence become a part of the trust assets, which obviously is what she wanted. The evidence indicates that Thomas and Svea were devoted to one another. However, Thomas did not give his interest to her; he conveyed it to the trustee, the effect of which was to give at least one-half, and perhaps all, of the property to Svea's relatives in Sweden. There is no evidence that Thomas wanted to do that with his property; he had a son of his own, and he had no other assets.

Reading the trust agreement to him, given his mental condition, was analogous to reading him a document written in a foreign language. *See Gilliam v. Schoen, supra.* The trust agreement is not a model of clarity. Among other things, it is not clear when the trust terminates. The trustee apparently has interpreted it to mean that the trust does not terminate on Svea's death, but terminates only after the residence is sold. Although we think that that is the most reasonable interpretation, what was Thomas to think? The trustee points out that he is "obligated" to maintain the trust estate and that, since Svea's death, he has paid the real property taxes on the residence in which Thomas has continued to live. It is true that the trustee is authorized to pay assessments and to maintain the trust property and that, if Thomas did not do so, the trustee probably could be required by the ultimate beneficiaries to do so. Does Thomas have the right to require it?

If Thomas had had independent advice and counsel, it would have been pointed out to him, among other things, that: (1) once he signed the deed to the trustee, he could not get the property back; (2) on Svea's death, if he did not sign a deed, he would own the entire property free and clear, whereas under the trust agreement he would have only the right to live in the house as long as he wanted and that, if he died while

living in the house and without having requested the trustee to sell it, his son would get nothing; (3) the trust agreement could be amended by Svea at any time without his knowing it to eliminate his right to live in the house; (4) even though the trustee might be required to pay the real property taxes if Thomas did not do so, if Thomas retained his interest in the house he could defer the real property taxes under ORS 311.668; (5) in any event, the value of his being able to live in the house and require the trustee to pay the real property taxes depended on how long he lived, and (6) whatever value was placed on what he might receive under the trust should be compared to the high probability of his owning outright, free and clear a house worth at least $50,000. His own attorney could also have evaluated whether Thomas was sufficiently competent to understand what was involved in the transaction, including the execution of the deed as it related to the provisions of the trust agreement.

In short, we think that this was a situation which cried out for independent advice and counsel. That factor has been considered an important one in every case in which the person gaining the benefit participates actively in the transaction. In *Gilliam v. Schoen, supra,* the court said that the failure of the grantee to safeguard the grantor's interest by insisting upon her receiving such advice was, in itself, sufficient to vitiate the deed. Here, as in that case, we consider that factor to be of tantamount importance, but, as indicated above, there are other factors that have been characterized as "suspicious circumstances."

■   Under all of the circumstances, we conclude that the trustee has not adduced sufficient evidence to overcome the adverse inference of undue influence. Although we attribute no malevolence to Svea, we conclude that she, by her conduct, gained an unfair advantage by devices which reasonable people regard as improper, *In Re Reddaway's Estate, supra,* and that plaintiff is entitled to a judgment setting aside the deed.

Reversed and remanded with instructions to enter judgment setting aside the deed and declaring Thomas Martin to be the owner of the Bryant Street property.