In the Matter of the Estate of
Hilda J. Olsen, Deceased.

Albert L. BIGEJ,
*Proponent - Appellant,*

*v.*

Keith BOYER,
Jo Ann Kloos and Deborah French,
*Contestants - Respondents.*

(P4748; CA A61616)

817 P2d 760

Douglas E. Kaufman, Tillamook, argued the cause and filed the briefs for proponent - appellant.

Kris J. Gorsuch, Salem, argued the cause for contestants - respondents. With him on the brief was Harland, Ritter, Saalfeld, Griggs, Gorsuch & Alexander, Salem.

Before Buttler, Presiding Judge, and Richardson* and De Muniz, Judges.

BUTTLER, P. J.

---

* Richardson, J., *vice* Rossman, J.

## BUTTLER, P. J.

Proponent in this will contest appeals from a judgment setting aside Hilda Olsen's will of May 28, 1987, and declaring that her January 13, 1986, will and the codicil thereto is her last will and testament.[1] He assigns as error the trial court's determinations that Hilda lacked testamentary capacity and was laboring under the undue influence of proponent, her husband Albert, on May 28, 1987; that bank accounts in the joint names of Albert and Hilda are the property of the estate and awarding attorney fees to contestants. We review *de novo, Williams v. Overton,* 76 Or App 424, 709 P2d 1115, *rev den* 300 Or 563 (1985), and affirm.

Hilda died February 3, 1988, at the age of 88, leaving an estate valued at over $700,000. She was survived by Albert, her husband of two years, proponent and sole beneficiary of her 1987 will. Hilda's only brother had died in 1950, leaving a daughter, Deborah, who then moved to Salem to live with Hilda and her first husband, Howard, for the next eight years. After Hilda's only sister, Edna, died in 1972, Edna's children, Keith and Jo Ann, continued to visit Hilda and to maintain a close family tie. Deborah, Keith and Jo Ann are the contestants.

Hilda and Howard were married around 1924. Hilda never learned to drive a car and never wrote a check while they were married; she relied completely on her husband to handle the finances. Both Hilda and Howard had executed numerous wills over the years and had maintained a consistent general plan: Each devised one-half to Howard's family and one-half to Hilda's. Hilda was devastated by Howard's death in 1976,[2] but continued living alone in their house. Although she had had no children, she relied on her extended family and friends for advice and help after Howard died. In 1979, she moved out of her house and into an apartment, because she could not maintain the house. She offered to give

---

[1] The judgment setting aside the will also ordered proponent to deliver to Keith Boyer, personal representative under the January 13, 1986, will, all real and personal property, accounts, documents and any other property belonging to the estate.

[2] Howard's 1976 will, which was probated, left one-half of his estate in trust, with income to Hilda for life, the remainder to his family. The other half went to Hilda.

Keith a one-half interest in the house if he would purchase the other half from Howard's trust. He agreed and moved into the house with his wife.

On July 15, 1981, Hilda executed an updated will bequeathing $2,500 to George and Beverly Johnson, $5,000 to Collene and Kirby Naugelhight, and the residue in equal shares to her three nieces, Jo Ann, Deborah and Jacqueline George, and her nephew, Keith. The will provided that $44,500 of the bequest to Keith be treated as an advance, because of her gift to him of her interest in her house.

By 1981, Hilda had moved to Madrona Hills, a retirement home, because her health was failing and she could no longer care for herself. She continued to receive frequent visits from her family and friends. Although she did not drive, she maintained a car and depended on male friends at the home, among whom was Albert, to drive her around town. Albert started living at Madrona Hills in April, 1984, following a nervous breakdown. He was 57, still married to his first wife, and had assets totalling $38,000. Hilda had assets then worth about $600,000. She was 80 years old when they met and suffered from obesity, hypertension, diabetes, untreated breast cancer and failing eyesight. Despite her declining health, Hilda and Albert often went on short trips together, travelling to Eugene and Corvallis for meals.

During an extended excursion to Mexico in May, 1985, they decided to be married, partly because she was not comfortable travelling with him while unwed. Five days before their planned wedding, Albert finalized the dissolution of his existing marriage. The day before the wedding, on June 11, 1985, they signed an antenuptial agreement prepared by the attorney (Anderson) who had handled Albert's divorce. Hilda discussed it with her attorney (Ritter) and Keith Boyer before signing it.[3] Hilda and Albert were married the next day, a month after the trip to Mexico.

---

[3] Pursuant to the agreement, each would own his or her own property; each waived the right to elect under ORS 114.115; the contract would not revoke existing wills; each retained the right to transfer property to the other during life or by will; neither would claim the other's property in the event of dissolution; and the contract would be effective upon marriage and be binding on their respective heirs, executors and administrators.

Soon after the wedding, Hilda was hospitalized for breast cancer, underwent a mastectomy, chemotherapy and an ulcer operation. She began chemotherapy treatments that made her ill. From then on, Hilda's health continued to decline. Albert contacted Anderson to prepare a document cancelling the antenuptial agreement and a new will for Hilda. The documents were signed on January 13, 1986. She had met with Anderson three or four times before she signed them. The new will provided for bequests to the Johnsons and Naugelhights identical to those in the 1981 will. Keith was designated as her personal representative and as trustee of a trust for Jacqueline. One- quarter of the residue was left to Albert and the balance was left to Kloos, French and Keith (less the $44,500 advance) in equal shares.[4] Ultimately, this will was upheld by the trial court.

On January 16, 1986, Hilda experienced confusion and disorientation. The next day she was admitted to a Salem hospital and diagnosed as having suffered a stroke, frontal cerebral atrophy, total disorientation and dementia. Because of the severity of her condition, Hilda signed a power of attorney naming Keith her attorney-in-fact. She was discharged from the hospital 12 days later and transferred to Capital View Care Center in Salem until health care could be arranged at Albert's Trask River home near Tillamook. On February 22, 1986, Hilda and Albert moved to the Trask River property, which was in a secluded area 11 miles east of Tillamook, more than an hour's drive to her closest relative. In the spring of 1986, they moved back to Salem, because Hilda felt lonely and secluded. They moved into the Lancaster Retirement Center where they lived until February, 1987. The nurses testified that Albert would put her to bed early and then go dancing with other women. He testified that he had had an affair during their short two-and-a-half-year marriage.

At the beginning of 1987, Hilda again experienced increased complications and her health deteriorated considerably. She was hospitalized on February 13 for 10 days. Two weeks later, she was admitted to St. Vincents hospital for congestive heart failure. Once again, on March 22, she was

---

[4] On January 30, 1986, Hilda executed a codicil eliminating the advancement clause.

hospitalized for eight days following another stroke. On May 1, Albert moved Hilda back to the Tillamook Care Center. The following week, on May 8, he met with Attorney Hathaway in Tillamook, who prepared a power of attorney for Hilda to sign, designating Albert as her attorney-in-fact, and another document cancelling the earlier one. He had Hilda sign them, then drove to Salem, where he obtained new signature cards for the purpose of changing Hilda's bank accounts to require both of their signatures. Hilda signed the cards a few days later. The nurses from the Tillamook Home Health Care testified to Hilda's demented condition during that period.

On May 27, Albert wheeled Hilda's wheelchair to the telephone so that she could call his attorney, Hathaway, to draw up another will. Hathaway came out that afternoon to see Hilda. The next day, he returned with the new will he had prepared, and Hilda signed it. Under that will, Albert was the sole beneficiary if he survived Hilda; if he did not, the entire estate went to Albert's two sons.

Hilda died the morning of February 3, 1988, at Albert's Trask River home. Later that morning, Albert was in his attorney's office to discuss probate proceedings. The morning of the funeral, Albert booked a trip to Hawaii for the following week. As personal representative of Hilda's estate, he withdrew approximately $218,633 from Hilda's accounts on February 22, and deposited them in his personal accounts. When he withdrew $180,000 to purchase traveller's checks, contestants became suspicious and obtained an order requiring Albert to show cause why the money should not be returned. The court ordered him to deliver the checks to his attorney; he returned only $140,000.

■■ Albert first assigns as error the trial court's finding that Hilda Olsen lacked testamentary capacity at the time she signed the May 28, 1987, will. To have testamentary capacity, a person must comprehend the nature of the act; know the nature and extent of her property; know the ones who are or should be the natural objects of her bounty; and understand the scope and reach of the provisions in the will. *Ingraham v. Meindl,* 216 Or 373, 339 P2d 447 (1959). Evidence of her mental capacity before and after she executed the will is relevant, although the critical time is May 28, 1987, when she

executed the will. *In re Murray's Estate,* 173 Or 209, 220, 144 P2d 1016 (1944).

■■    The attorney who drafted the will, Hathaway, testified that Hilda had testamentary capacity on May 28. The other subscribing witness failed to testify either way. Generally, the testimony of subscribing witnesses as to capacity is given great weight. However, in *Hurd v. Mosby,* 47 Or App 951, 615 P2d 1115 (1980), we discounted the testimony of the subscribing witnesses, an attorney and his secretary, and relied, instead, on that of medical experts. We said that, because the subscribing witnesses had only minimal contact with the testatrix, their testimony was not as persuasive as that of the physician and nurses who had had extended contact with her before and after the will was executed. Here, Hathaway had little contact with Hilda; he had never spoken with her until May 27, 1987, and was not familiar with her mental or medical condition.

Several medical experts testified. Dr. Westermeyer examined Hilda on May 12 at Albert's request. Hilda began the visit by asking the doctor to get into bed with her. On the basis of that examination alone, he thought that it was "unlikely that she would have ability to do much in a legal sense." In response to a lengthy hypothetical question put to him by Albert's attorney, he said that she might have had testamentary capacity. Dr. Ziven, Hilda's neurologist, testified to Hilda's "tremendous" frontal cerebral atrophy and degeneration in the part of the brain where thinking, judgment and planning are derived. Her condition was irreversible, he said, and resulted in confusion and disorientation. He had treated and observed her on many occasions in late March, 1987. According to him, she could have been programmed to answer yes or no questions, but could not have understood the question and could not have had testamentary capacity on May 28. Dr. McDonald, who treated Hilda in March and April, 1987, agreed that she did not have testamentary capacity then and that her condition would not have improved. There is other testimony by nurses, friends and family concerning their everyday observations of Hilda that were consistent with Ziven's medical opinion.

Although Hathaway testified that he believed that Hilda had testamentary capacity when she signed the will, he

was not aware of Hilda's medical and mental problems. The other subscribing witness, a nurse, was not asked whether Hilda was competent to make a will and did not sign an affidavit stating that Hilda was competent when the will was offered for probate. Contrary to Hathaway, she testified that there was no conversation between Hilda and anyone while she was present to witness the will.

Notwithstanding the overwhelming evidence that Hilda lacked testamentary capacity for at least several months before the questioned will was executed, Albert contends that she signed the will during a lucid interval. The medical evidence is strong that Hilda's brain had been so severely damaged that she had lost her ability to think, analyze or put things together, and that her condition was not reversible. Unlike the testators in the cases on which proponent relies, Hilda was not mentally ill or "insane"; there is no evidence that she had lucid periods, although she had "good" days and "bad" days. We agree with the trial court that the evidence is not sufficient to find that Hilda signed the will during a lucid interval.

Given our conclusion that contestants have sustained their burden to prove that Hilda was not competent to make a will, it is not necessary to decide whether the will was the product of undue influence exerted by Albert. We agree, however, with the trial court's conclusion that it was.

■ Proponent next assigns as error the trial court's holding that Hilda's bank accounts are part of her estate. On May 8, 1987, Albert met with his attorney, who prepared a new power of attorney by which Hilda appointed Albert her attorney-in-fact and a document revoking Keith Boyer's power of attorney. Hathaway testified that he never spoke with Hilda about that transaction. On May 12 and 15, 1987, Albert had Hilda sign new signature cards for her bank accounts, requiring his signature as well as hers. In February, Albert, as her attorney-in-fact, changed them to require only his signature. If the power of attorney and signature cards were signed by Hilda when she was competent and was not subject to Albert's undue influence, the money in the accounts would go to Albert, as the surviving party, because they were survivorship accounts. ORS 708.616(1). Given that Hilda was not competent to make a will during this time

frame, she was not competent to make an *inter vivos* transfer of her property. In *Ryan v. Colombo,* 77 Or App 71, 76, 712 P2d 139 (1985), we said:

> "A grantor is required to possess greater competency to execute a deed than is required of one executing a will, because a deed is irrevocable and a will is not, and also because a grantor, unlike a testator, must deal with another party to the transaction."

The same is true with respect to the transfer of bank accounts. The evidence establishes that Hilda did not have the ability to understand the nature and effect of what Albert had her do. Furthermore, as with the will, she was subject to the undue influence of Albert, the donee.

■ Finally, Albert assigns as error the trial court's awarding contestants attorney fees, costs and disbursements from the estate. He argues that the trial court lacked jurisdiction to do so after he filed his notice of appeal from the judgment on the merits, which specifically did not decide whether any party was entitled to attorney fees. The court retains jurisdiction to award costs and attorney fees. ORS 19.033(1). Although Albert now assigns other errors, none of them was preserved in the trial court, and we decline to consider them.

Affirmed.