Argued and submitted June 12, 2003, affirmed April 28, petition for review denied September 8, 2004 (337 Or 327)

In the Matter of the Marriage of

## Martin S. DAVIS,
*Respondent,*
*and*

## Maria C. DAVIS,
*Appellant.*

C001651DR; A116839

89 P3d 1206

Margaret H. Leek Leiberan argued the cause and filed the briefs for appellant. With her on the reply brief was Barbara Aaby.

Barry Adamson argued the cause for respondent. With him on the brief were John Moore and Moore & Associates, P.C.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

PER CURIAM

Deits, C. J., concurring.

## PER CURIAM

Wife appeals from a judgment denying her request to set aside a stipulated dissolution judgment. Wife argues that she was not mentally competent at the time that she stipulated to the judgment and that the trial court erred in finding otherwise; in particular, she asserts that the trial court applied the wrong legal test in determining her competency. We review the trial court's choice of legal standard for errors of law and affirm.

In denying wife's motion, the trial court noted that courts have applied two tests to determine mental competency in similar circumstances: the "cognitive test" and the "affective test." Under the cognitive test, a person is competent if he or she has the capacity "to understand the nature of the act and to apprehend its consequences." *Gore v. Gadd*, 268 Or 527, 528, 522 P2d 212 (1974) (internal quotation marks omitted). The cognitive test is the test that Oregon courts appear to follow. Wife argues, however, that we should adopt the broader affective test. Under the affective test, a person is incompetent if the person is "unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition." *Restatement (Second) of Contracts* § 15(1)(b) (1979).

As noted in the concurrence, in some cases, Oregon courts may have applied certain aspects of the affective test in determining competency. Nevertheless, the cognitive test appears to be the law of this state, and we are bound to follow it. Accordingly, we hold that the trial court did not err in applying the cognitive test. The record supports the trial court's conclusion that, under the cognitive test, wife was competent to enter into the stipulated judgment. We affirm on wife's other assignments of error without discussion.

Affirmed.

**DEITS, C. J.,** concurring.

I agree with the majority that the trial court did not err in applying the cognitive test or in concluding that, under the cognitive test, wife was mentally competent to enter into the stipulated judgment. However, I write separately to note

that it may be appropriate to reexamine and clarify the law of mental competency to enter into contracts in light of recent developments in this area of the law.

Husband and wife were married for approximately 17 years. The parties have two minor children, who were 8 and 10 years old at the time that the stipulated judgment was entered. The marriage apparently involved numerous instances of domestic violence. Husband was arrested on one occasion for domestic abuse while the parties were living in Arizona. Wife obtained two restraining orders against husband in Oregon, and he was arrested for violating a restraining order on one occasion. Husband ultimately moved out of the parties' residence in April 2000 and filed for dissolution the following September.[1]

Wife began seeing a clinical social worker in May 2000, shortly after the parties separated. The social worker testified that wife "loved [husband] enormously and she feared him enormously." Wife was diagnosed as suffering from depression, post-traumatic stress disorder, and battered woman's syndrome. Wife's social worker indicated that wife's great fear of husband was triggered by seeing husband and that, when one is in a significant amount of fear, "you can't think straight. I mean you can't think at all literally in terms of the hemispheres of the brain. The hemisphere that's thinking is disabled by the stress brought on by the feared person." The social worker also stated that wife was deeply grieving and working 60 hours a week in a job in which she was sustaining "vicarious trauma" because she was translating for the Department of Human Services, a job that had the potential of recalling her own incidents of domestic violence. Wife's first lawyer described wife as "very emotionally distraught and that's putting it mildly. She was sort of [on] a roller coaster in terms of emotional states. One day she would be * * * fine and another day, she would be sobbing and she

---

[1] Husband maintains that wife relies on facts that "neither the law nor common sense makes relevant," because only the facts at the time of the stipulated judgment are relevant. However, while it is true that competency must be determined at the time of execution of the contract, *Uribe v. Olson*, 42 Or App 647, 651, 601 P2d 818 (1979), the facts that lead up to and surround that time period are unequivocally relevant because wife's mental state was affected by the circumstances preceding the execution of the stipulated judgment.

was very fragile emotionally * * *." Wife's second lawyer described wife's emotional state during the course of the dissolution proceedings in a similar fashion, stating that she would go from being in a calm state to "crying in a hysterical kind of spells."

On March 13, 2001, the parties attended a settlement conference in an attempt to work out a property division and custody arrangement. At issue in part were the parties' stock options in Intel and their interest in a computer software company.[2] Wife testified that, during that meeting, she was not thinking about the property division but rather that "the next day was going to be the last that I was going to be married to [husband]." The conference was adjourned at one point because emotions elevated to what the parties felt was an unproductive level. During the adjournment, husband and wife were left alone. Wife expressed her desire to reconcile with husband, and, as the trial court found, husband "left the door ajar on that issue." When the settlement conference reconvened, the parties arrived at a tentative agreement to split the Intel stock options. The parties' interest in the computer software company was not discussed. Wife left the conference that day "in hopes that she was somehow going to pull the marriage back together." The parties shared a phone call later that night, but they did not discuss negotiations about the settlement.

The settlement conference continued the next day. On her way to the conference, wife told her children that she was "going to go and get my marriage back." Wife's attorney thought that wife seemed "pretty upbeat" that morning and that wife told him that she believed that she and husband were reconciling. When wife saw husband that morning, she was "happy to see him. I saw him dressing very nice, and I just felt like maybe we were going to get married." Husband, however, stated that he wanted to proceed with the dissolution. From that point, wife "sort of lost it." Her attorney would attempt to explain something to her and "tears would

---

[2] Although there was some question about the exact value of the interest in the software company, three years before the dissolution hearing, husband had received a buyout offer of $1,214,000 and refused it because he thought that the value was higher. At the hearing on wife's motion to set aside the judgment, an expert testified that the interest could be worth as much as $2,905,000.

just be rolling down her eyes. She was shaking * * *. Then it would seem like all of a sudden she would come back and she'd take a deep breath and then it seemed like she was tracking and then I'd look over again and she would be crying again. So, it was sort of like this roller coaster."

Husband's attorney had arrived on that day with a proposed stipulated judgment, which, according to wife's attorney, gave all the Intel stock and all of the interest in the software company to husband. Wife's attorney believed that the parties had agreed to split the stock and had assumed that they would reach a similar agreement about the interest in the software company. Wife's attorney advised her not to take less than half of the stock and half of their interest in the company. At that point, wife looked "[s]ort of like a zombie." She asked to speak to her husband in private, and according to wife, husband verbally assaulted her. At that point, wife testified that

> "I don't know what happened. I just start[ed] to think about it, and you know, all of this fighting and all of this commotion back and forth, fighting for something that I didn't even know what it was. I thought, well, I'm not going to fight anymore. I remember I prayed, and I was feeling that God was with me and it was okay; whatever happened, it was His will, and it was okay, that He would take care of me."

When the attorneys returned, wife told her attorney that "I want this over, let's go." Her attorney attempted to dissuade her, but wife was adamant that she wanted the proceedings to be over. Wife told her attorney to "[g]ive [husband] what he wants" and that she did not want anything. In the end, against the advice of her attorney, wife signed an agreement under which husband received all of the Intel stock options and all of the interest in the software company. Wife later recalled that she had heard the voices of the judge and lawyers talking but "not really understanding what was going on." Her only goal at that time was to "go—go far—go away. * * * I say my only want * * * was to go away from this place, run and go, and go to sleep[.]"

Approximately a week after the settlement conference, wife was admitted to a hospital psychiatric unit for several days. A psychologist who examined wife on March 29

and 30 concluded that wife was not capable of engaging in rational decision-making on the day that she entered into the stipulated judgment. He concluded that "all of her decision-making processes were going to be compromised," reflected in wife's "floating" and "emotional over-control" behavior. He diagnosed wife as suffering from a severe degree of emotional disturbance and stated that people, like wife, who are in a dissociative state are "going to be doing whatever they can do to extricate themselves from that spot as rapidly as possible. Basically they're going to give in." In addition, wife's social worker also concluded that wife may not have understood anything that happened on March 14.

Wife moved to set aside the stipulated judgment a month after she entered into it, relying on ORCP 71 C.[3] Wife claimed, in part, that she was not competent at the time that she signed the stipulated judgment and she was therefore incapable of giving her consent to the agreement. After hearing significant testimony, the trial court discussed the two tests for determining competency: the traditional cognitive test and the more modern affective test. The trial court determined that it was obligated under the law to apply the cognitive test and that, under that test, wife had been mentally competent to enter into the stipulated judgment. Accordingly, although the trial court found that the stipulated judgment was "grossly inequitable in its substance," the court refused to set it aside.

On appeal, wife contends that a stipulated judgment may be set aside under ORCP 71 C for reasons adequate to support rescission of a contract. *Auble and Auble*, 125 Or App 554, 559, 866 P2d 1239 (1993), *rev den*, 318 Or 478 (1994); *Renninger and Renninger*, 82 Or App 706, 711-12, 730 P2d 37 (1986). One such reason is lack of competency to enter into a contract. *Goodman v. Micka*, 151 Or App 27, 31, 949 P2d 1222 (1997), *rev den*, 326 Or 389 (1998). As explained in the

---

[3] ORCP 71 C provides:

"This rule does not limit the inherent power of a court to modify a judgment within a reasonable time, or the power of a court to entertain an independent action to relieve a party from a judgment, or the power of a court to grant relief to a defendant under Rule 7 D(6)(f), or the power of a court to set aside a judgment for fraud upon the court."

majority opinion, wife argues that the trial court used the incorrect legal standard to determine competency. The thrust of her argument is that Oregon law appears to use the affective test, or something akin to it, in addition to the traditional cognitive test. Wife maintains that, under the affective test, she was not mentally competent to consent to the stipulated judgment.

As I will discuss, Oregon case law is not entirely clear. Generally, the cognitive test appears to be the rule of law in Oregon. A few cases, however, contain language suggesting that our courts have been receptive to adopting elements of the affective test. Nonetheless, I must agree with the trial court that the cognitive test is the test most recently adopted and employed in our case law and was, accordingly, the proper test to apply in this case.

Oregon courts have traditionally stated and employed the "cognitive test" for mental competency to enter a contract. Under that test, a person is competent if he or she has "the capacity to understand the nature of the act and to apprehend its consequences." *Gore v. Gadd*, 268 Or 527, 528, 522 P2d 212 (1974) (internal quotation marks omitted). The most recent cases in Oregon recite that test and apply it in similar fashion. *See, e.g., Dillin v. Alexander*, 281 Or 679, 684-85, 576 P2d 1248 (1978); *Bigej v. Boyer*, 108 Or App 663, 670-71, 817 P2d 760 (1991), *rev den*, 313 Or 74 (1992); *O'Brien v. Belsma*, 108 Or App 500, 503, 816 P2d 665 (1991); *Ryan v. Colombo*, 77 Or App 71, 76, 712 P2d 139 (1985).

The "affective test," also termed the "modern test" or the "volitional test," has been adopted by some other jurisdictions. Under the affective test, a person may be aware of the nature and consequences of his or her conduct, but is considered incompetent because mental illness has rendered him or her "incapable of making a rational judgment in the execution of the transaction * * *." *Gore*, 268 Or at 528.

One of the first cases recognizing the affective test was *Ortelere v. Teachers' Retirement Bd. of New York*, 25 NY2d 196, 303 NYS2d 362, 250 NE2d 460 (1969). In that case, a surviving husband sought to set aside a retirement application completed by his wife on the ground that she had

been mentally incompetent at the time that she completed the application. The New York court noted that the traditional competency test is whether "the mind was 'so affected as to render him [or her] wholly and absolutely incompetent to comprehend and understand the nature of the transaction.' " *Id.* at 202, 303 NYS2d at 367, 250 NE2d at 464. However, the court also noted that the traditional standard had been formulated when knowledge in the field of psychiatry was "quite primitive" and that the traditional standard "fail[ed] to account for one who by reason of mental illness is unable to control his [or her] conduct even though his [or her] cognitive ability seems unimpaired." *Id.* at 203, 303 NYS2d at 368, 250 NE2d at 464. The court concluded that the cognitive test was too restrictive and was based on false factual and medical bases. Consequently, it adopted what is now called the affective test. *Id.* at 203-04, 303 NYS2d at 368-69, 250 NE2d at 464-65.

Of particular persuasiveness to the *Ortelere* court was the fact that the *Restatement (Second) of Contracts* (1979), for similar reasons, had adopted a more modern approach.[4] *Restatement* section 15 provides:

"(1)   A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect

"(a)   he is unable to understand in a reasonable manner the nature and consequences of the transaction, or

"(b)   he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition."

The commentary to the *Restatement* notes that

"[i]t is now recognized that there is a wide variety of types and degrees of mental incompetency. Among them are congenital deficiencies in intelligence, the mental deterioration of old age, the effects of brain damage caused by accident or organic disease, and mental illnesses evidenced by

---

[4] Although the *Restatement (Second) of Contracts* was not completed until 1979, a draft of the revision was available to, and quoted by, the *Ortelere* court in 1969. *See Restatement* at vii. The version of the portion of *Restatement* section 15 relied upon by the *Ortelere* court is identical to the one ultimately published in the *Restatement (Second) of Contracts*.

such symptoms as delusions, hallucinations, delirium, confusion and depression. * * * [A] person may be able to understand almost nothing, or only simple or routine transactions, or he may be incompetent only with respect to a particular type of transaction. Even though understanding is complete, he may lack the ability to control his acts in the way that the normal individual can and does control them * * *. Where a person has some understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction in its result is one which a reasonably competent person might have made."

*Restatement* § 15 comment b.

As wife notes, portions of some Oregon cases may be read as acknowledging the superiority of the affective test. In *First Christian Church v. McReynolds*, 194 Or 68, 72-73, 241 P2d 135 (1952), the court stated:

"[A] grantor[5] must be able to reason, to exercise judgment, to transact ordinary business and to compete with the other party to the transaction."[6]

(Citations omitted.) Wife asserts, and I agree, that the emphasized language may represent a departure from the traditional cognitive test and perhaps a move, in part, toward the affective test. That language has a distinctly "affective test" feel to it and, indeed, sounds very similar to the *Restatement* language. However, the *First Christian Church* court expressly indicated that the cognitive test applied: the "test of mental capacity * * * requires that a person shall have ability to understand the nature and effect of the act in which he is engaged and the business which he is transacting." *First Christian Church*, 194 Or at 72. In addition, the court observed that "neither old age, sickness, debility of body nor extreme distress incapacitates a party * * *." *Id.* at 73.[7]

---

[5] Although *First Christian Church* involved a deed, the competency test for making a deed and entering into a contract is the same. *See Gore*, 268 Or at 528.

[6] Similar statements appear in *Legler et al. v. Legler*, 187 Or 273, 308, 211 P2d 233 (1949), and *Miller et al. v. Jeffrey et al.*, 129 Or 674, 687, 278 P 946 (1929).

[7] In several subsequent cases, the Supreme Court has relied on the *First Christian Church* statement of the test for competency, quoting the portions of that opinion that I have set out. *E.g., Dillin*, 281 Or at 684-85; *Bartlett v. Whidden*, 252 Or 501, 504-05, 449 P2d 850 (1969). The court's analysis in those cases, however, indicates that the court applied the cognitive test. *Dillin* in particular

Moreover, the Oregon Supreme Court, in its most recent direct statement on this issue, has indicated that the cognitive test continues to be the law in Oregon. In *Gore*, the plaintiff urged the Supreme Court to adopt the affective test, arguing that the cognitive test is too restrictive. 268 Or at 528-29. The plaintiff relied on *Ortelere*; another New York case, *Faber v. Sweet Style Mfg. Co.*, 40 Misc 2d 212, 242 NYS2d 763 (Sup Ct Nassau County 1963); and the *Restatement*. The Supreme Court observed that "the test for competency heretofore applied in Oregon * * * [is] the 'cognitive test.'" *Id.* at 528. In response to the plaintiff's argument that the court should adopt the affective test, the court stated:

> "Th[e New York] cases, responding to advances in psychiatric knowledge, [held] that competence can be lost through 'affective' as well as 'cognitive' disorders. Psychiatry teaches that one who is afflicted with an affective disorder, such as a manic-depressive psychotic, may be impelled to act irrationally although fully conscious of what he is doing."

*Id.* at 529. The court declined, however, to adopt the affective test—not because the court considered the cognitive test to be better, but because the plaintiff was competent under either test: "As we have already explained, the evidence conclusively shows that plaintiff was competent under the cognitive test. *Assuming, without deciding, that the test of competency should be extended to include affective disorders*, we find the evidence to be insufficient to establish that plaintiff was incompetent." *Id.* at 530 (emphasis added). Since *Gore*, Oregon courts have, consistently with *Gore*'s implied retention of the cognitive test, continued to use the cognitive test only. *See, e.g., Dillin*, 281 Or at 684-85; *Bigej*, 108 Or App at 670-71; *O'Brien*, 108 Or App at 503; *Ryan*, 77 Or App at 76.

---

demonstrates that the court continues to apply the cognitive test; the court concluded that the plaintiff was competent by stating, "His testimony indicates *he was aware of the significance of his execution of the deed* and was satisfied at that time *with the consequences of his actions*." 281 Or at 685 (emphasis added). *See also Toomey v. Moore et ux*, 213 Or 422, 434, 325 P2d 805 (1958) (citing *First Christian Church*, 194 Or at 72, and concluding, "[The grantor] may have understood that she was executing a deed conveying her home to the defendants but we are satisfied that she had no understanding of the legal or practical consequences of that improvident act.").

In my view, the affective test reflects a more up-to-date understanding of human behavior and is more consistent with modern psychological theories of mental health. It appears that courts in other jurisdictions that have recently considered the question have agreed with my view. *See* Gregory E. Maggs, *Ipse Dixit: The Restatement (Second) of Contracts and the Modern Development of Contract Law*, 66 Geo Wash L Rev 508, 518-19 (1998) (nearly all courts considering the issue have adopted the affective test). Although the majority correctly holds that we are bound to follow precedent, which requires us to employ the cognitive test, it would seem appropriate to reevaluate this test and adopt a test incorporating all or part of the affective test, such as that included in the *Restatement*.[8] The application of the affective test, as incorporated in the *Restatement*, to this case would likely lead to a different and more equitable result.

For the reasons stated above, I concur.

---

[8] Oregon courts have relied on the *Restatement* in other circumstances. *See, e.g., Hatley v. Stafford*, 284 Or 523, 532, 588 P2d 603 (1978); *Raymond v. Feldmann*, 124 Or App 543, 546, 863 P2d 1269 (1993), *rev den*, 318 Or 381 (1994).